[No. D001853. Fourth Dist., Div. One. Aug. 4, 1986.]

RONALD L. BARRETT et al., Plaintiffs and Appellants, v.
BANK OF AMERICA, Defendant and Respondent.

**COUNSEL**

Jerry D. Cluff, Pain, Pippin, Cluff & Olson and Richard C. Wildman, Jr., for Plaintiffs and Appellants.

David S. Folsom, Folsom, McKesson, Duke & LeVine, F. P. Crowell, Marcelle E. Mihaila and Gray, Cary, Ames & Frye for Defendant and Respondent.

**OPINION**

**WIENER, J.**—Plaintiffs Ronald and Carole Barrett appeal from the judgment entered on a special verdict in favor of defendant Bank of America. We conclude the court prejudicially erred in failing to instruct the jury on constructive fraud and reverse the judgment.

### Factual and Procedural Background

Ronald and Carole Barrett (Barretts) were principal shareholders in Pride Electronics, Inc. (Pride). Pride obtained a $253,000 Small Business Administration (SBA) loan and a $400,000 accounts receivable line of credit with Bank of America (Bank). In connection with these loans, the Barretts executed two continuing personal guarantees to the Bank: one in the amount of $655,000 and one on an SBA form in the amount of $253,000 secured by trust deeds on a house in Vista and the Barrett residence in San Diego. This dispute focuses on the personal guarantees.

Less than a month after funding the loans, the Bank informed the Barretts they were in "technical default" because the June 30, 1977, financial statement revealed Pride's net worth and liability to asset ratios no longer conformed with the Bank's requirements. David Chaffee (Chaffee), the Bank's loan officer assigned to the Pride account, suggested three ways to improve Pride's financial situation: (1) profits; (2) selling stock; and (3) bringing in new investors by way of merger or acquisition. In response to Ronald Barrett's concern about a merger's effect on the loan commitments, Chaffee told Barrett a company that merged with Pride would be responsible for the loans and the Bank would release the Barretts' personal guarantees.

Pride began merger discussions with Coded Communications (Coded), but the initial proposals were unacceptable to the Barretts because they did not include release of the personal guarantees. Coded eventually modified its position and agreed to release of the guarantees six months after the closing date of the merger.[1]

The merger was finalized on December 28, 1977. Bank of America extended accounts receivable financing to Coded after the merger and accepted Coded's application for an SBA-guaranteed loan in the amount of

---

[1]Paragraph 4.09 of the Plan of Reorganization and Exchange Agreement between Pride and Coded reads in part: "Coded agrees that at the Closing it will execute a guaranty of (a) Pride Industries' existing loan (the 'Loan') from Bank of America guaranteed by the Small Business Administration in an amount not to exceed $250,000, and (b) a line of credit for Pride Industries at Bank of America not to exceed $400,000, secured by 70% of the face amount of Pride Industries' accounts receivable. Coded will hold Barrett harmless from liability for payment under his guaranty of the Loans in amounts not to exceed those set forth in (a) and (b) above, provided, that . . . all representations, warranties and agreements of Barrett shall have been true and correct at the date hereof and on the Closing Date, and provided further, that such hold harmless agreement shall continue only so long as such representations, warranties and agreements shall so continue to be true and correct subsequent to the Closing Date. Effective six months after the Closing Date, Coded consents to the release of Barrett as a guarantor of the Loans, and Coded agrees to cooperate in the execution of any documentation which may be reasonably required to accomplish such release. . . ."

$500,000, part of which was to be used to pay off Pride's SBA loan. Neither the $500,000 loan nor a $275,000 loan was ever consummated because of Coded's first quarter loss of $340,000.

Due to its losses, Coded notified the Bank in spring 1978 it could no longer make payments on the Pride SBA loan and the Bank requested the SBA honor its guarantee. Shortly thereafter, in the summer of 1978, Coded filed for protection under Chapter 11 of the United States Bankruptcy Code. The Bank assigned its collateral to the SBA including the Pride note, the Barretts' SBA guarantee, and the trust deed securing that guarantee. Foreclosure proceedings were initiated against the Barrett residence by holders of the first and second deeds of trust. To prevent total loss, the Barretts sold the home and the SBA demanded the proceeds of sale.

The Barretts' first amended complaint against Bank of America alleges breach of contract, fraud, conspiracy to defraud, intentional infliction of emotional distress and negligence, based on the Bank's failure to honor its alleged promise to release the Barretts' personal guarantees upon the merger of Pride and Coded.

The court bifurcated the liability and damage phases of trial immediately before selection of the jury and noted "the essential issue in the first phase will be whether there was a promise either in conversation or impliedly revealed by a course of conduct on the part of the bank to release plaintiffs from their guarantee." At the close of the liability phase of trial, the court rejected the instructions requested by the Barretts on negligence, breach of contract, constructive fraud, conspiracy. The court concluded it could resolve all the contract issues as a matter of law after reviewing the jury's responses to special interrogatories on the fraud issues. It rejected the conspiracy instructions on grounds there was no separate cause of action for conspiracy apart from the fraud theories already presented to the jury. Although the court stated misgivings on whether the evidence supported instructions on subspecies of fraud other than a promise made without the intention of performing, it agreed to instruct separately on all types of fraud and deceit including negligent misrepresentation. No specific reason was stated for the court's rejection of instructions on constructive fraud. The court modified the special verdict form submitted by the Barretts on the fraud issues and submitted it to the jury.

The parties and the court were surprised by the combination of responses that appeared on the jury's special verdict. The jury found that (1) Ronald Barrett reasonably believed he and his wife would be released from the personal guarantee on the SBA loan, (2) Chaffee had expressly promised the Barretts would be released from the personal guarantees at or after the

consummation of the merger, but that (3) Chaffee did not make the assertion in a manner not warranted by the information known to him.[2] The court interpreted the special verdict as a definitive factual finding against the plaintiff on any fraud theory because of the absence of scienter. The Barretts' counsel argued that the absence of scienter would not necessarily defeat a cause of action for constructive fraud and that they believed the court's

---

[2]The special verdict reads as follows:

"We, the jury in the above-entitled case, find the following Special Verdict on the issues submitted to us:

"1. Did the plaintiff Ronald L. Barrett reasonably believe that at or after the consummation of the Pride/Coded merger, he and his wife would be released from their personal guaranty to the Bank of America upon the $253,000 loan guaranteed by the SBA:

<u>10</u> Yes      <u>2</u> No.

"If you answered 'yes' to Issue 1, then please answer the next issue.

"2. Would plaintiff have consented to the Pride/Coded merger if he did not hold such a reasonable belief?

<u>2</u> Yes      <u>10</u> No.

"If you answered 'no' to Issue 2, then please answer the next issues.

"3. [Suggestion or implied promise]. On or before December 28, 1977, did Mr. Chaffee, through his acts, statements, and/or conduct, lead plaintiff to believe that he and his wife would be released from the Bank of America personal loan guarantees at or after the consummation of the Pride/Coded merger?

<u>9</u> Yes      <u>3</u> No.

"If you answered 'yes' to Issue 3, then please answer the next issue.

"4. Did Mr. Chaffee make any such suggestion or implied promise while not believing it to be true?

<u>    </u> Yes      <u>12</u> No.

"Please answer the next issue.

"5. [Express promise or assertion]. On or before December 28, 1977, did Mr. Chaffee expressly promise or assert to plaintiff that he and his wife would be released from the Bank of America personal loan guarantees at or after the consummation of the Pride/Coded merger?

<u>9</u> Yes      <u>3</u> No.

"If you answered 'yes' to Issue 5, then please answer Issues 6 and 7.

"6. Did Mr. Chaffee make such an assertion positively, in a manner not warranted by the information known to him, whether or not he believed it to be true?

<u>    </u> Yes      <u>12</u> No.

"7. Did Mr. Chaffee make such a promise without any intention that it would be performed?

<u>    </u> Yes      <u>12</u> No.

"8. [Suppression of fact]. On or before December 28, 1977, did Mr. Chaffee wilfully and knowingly suppress any fact which would have revealed to plaintiff that the Bank of America did not intend to release plaintiffs from the Bank of America personal loan guarantees at or after the consummation of the Pride/Coded merger?

<u>2</u> Yes      <u>10</u> No.

"If you answered 'yes' to any of Issues 4, 6, 7 or 8, please answer the next issue.

"9. Was such suggestion, act, statement, conduct, promise or suppression done or said by Mr. Chaffee with the intent of inducing Mr. Barrett to consent to the Pride/Coded merger?

<u>    </u> Yes      <u>    </u> No.

"If you answered 'yes' to Issue 9, please answer the next issue.

"10. Was plaintiff justified in relying upon any such suggestion, act, statement, conduct, promise or suppression?

<u>    </u> Yes      <u>    </u> No."

bifurcation of the trial had foreclosed presentation of the negligence issues. Nonetheless, the court rejected the request for instructions on constructive fraud and negligence on grounds counsel had the opportunity to plead and offer instructions on those theories. The court believed counsel had elected not to complicate the issues presented to the jury and thus could not "go back to the well for another pail of water at this stage on those issues." However, the court submitted a second special verdict form to the jury with a single question pertaining to the breach of oral contract cause of action. At the Barretts' request the court instructed the jury that plaintiffs had the burden of proving the additional fact by clear and convincing evidence.

In the supplemental special verdict the jury found the Bank had not, through Mr. Chaffee, promised to release the Barretts from their personal guarantee within six months after the merger had been consummated.[3] Judgment was entered in favor of the Bank. This appeal ensued.

DISCUSSION

I

The Barretts' multipronged attack on the judgment includes strong criticism of the court's decision to bifurcate trial, submit a supplemental special verdict to the jury, and require proof of oral modification of contract by clear and convincing evidence. We conclude the Barretts' argument on instructional error is dispositive of this appeal and do not discuss the other contentions.

In reviewing the record we are struck by the apparent inconsistencies in the jury's special verdicts. Based on the jury's response to issues 1 to 5, we would have thought the Barretts had won their case. With this justifiable mental set we focus on constructive fraud, an alternate theory of liability for which the Barretts requested jury instructions.

Constructive fraud consists of: "1. In any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or any one claiming under him, by misleading another to his prejudice, or to the prejudice of anyone claiming under him; or, [¶] 2. In any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud." (Civ. Code, § 1573.) ██ "In its generic sense, constructive fraud comprises all acts, omissions and concealments involving a breach of

---

[3]The supplemental special verdict reads as follows:
"11. Did the Bank, through Mr. Chaffee, promise to release the Barretts from their personal guaranty within six months after the merger was consummated?

  2   Yes      10   No."

legal or equitable duty, trust, or confidence, and resulting in damages to another. [Citations.] Constructive fraud exists in cases in which conduct, although not actually fraudulent, ought to be so treated—that is, in which such conduct is a constructive or quasi fraud, having all the actual consequences and all the legal effects of actual fraud." (*Estate of Arbuckle* (1950) 98 Cal.App.2d 562, 568 [220 P.2d 950].) Constructive fraud usually arises from a breach of duty where a relation of trust and confidence exists. (*Darrow v. Robert A. Klein & Co., Inc.* (1931) 111 Cal.App. 310, 315-316 [295 P. 566].) Confidential and fiduciary relations are in law, synonymous and may be said to exist whenever trust and confidence is reposed by one person in another. (*Estate of Cover* (1922) 188 Cal. 133, 143 [204 P. 583].) ■ The relationship of a bank to depositor is at least quasi-fiduciary. (*Commercial Cotton Co.* v. *United California Bank* (1985) 163 Cal.App.3d 511, 516 [209 Cal.Rptr. 551].) Other jurisdictions recognize a similar relationship of trust and confidence exists between a bank and its loan customers which gives rise to a duty of disclosure of facts which may place the bank or a third party at an advantage with respect to the customer. (See *Klein* v. *First Edina National Bank* (1972) 293 Minn. 418 [196 N.W.2d 619]; *First National Bank in Lenox* v. *Brown* (Iowa 1970) 181 N.W.2d 178; *Stewart* v. *Phoenix Nat. Bank* (1937) 49 Ariz. 34 [64 P.2d 101].)

■ Here there is substantial evidence to support the constructive fraud theory. Ronald Barrett perceived his relationship with Chaffee as very close and he relied on Chaffee's financial advice implicitly. Because of the feeling of trust and reliability Barrett shared confidential financial information concerning unfavorable developments in the C.B. industry. Barrett also relied on Chaffee's advice on mergers. Newlon Benner, a consultant for Coded, testified that in response to Coded's concerns about release of the guarantees after the merger Chaffee assured him the SBA would never agree to release the Barretts' guarantees. Barrett did not learn of this alleged conversation until 1980. The facts also indicate the bank stood to benefit from the merger.

■ Each party to an action is entitled to have the jury instructed on all theories of the case supported by the pleadings and the evidence. (*Ng* v. *Hudson* (1977) 75 Cal.App.3d 250, 254 [142 Cal.Rptr. 69].) Refusal to give an instruction on a theory which is supported by substantial evidence is prejudicial error. (*Phillips* v. *G. L. Truman Excavation Co.* (1961) 55 Cal.2d 801, 807 [13 Cal.Rptr. 401, 362 P.2d 33].) Although evidence on the proponent's theory may be weak when compared to other theories in the case, the trial judge has no legal right to weigh the conflicting evidence by refusing the instructions. (*Id.,* at pp. 807-808.)

■ Following the liability phase of trial the court limited its instructions to various fraud theories, rejecting the Barretts' request for instructions on

constructive fraud. The request was renewed and again rejected before submission of the supplemental special verdict. Once the instructions were rejected, all dialogue concerning related issues ceased.[4] The court acknowledged at that time constructive fraud issues might have been present in the case. Based on this record, the court erred in failing to give the requested constructive fraud instruction.

■ At first blush the jury's finding of no negligent misrepresentation would seem to eliminate any prejudice arising from the court's rejection of the constructive fraud instruction. However, when we parse the jury's findings we conclude there is a substantial likelihood the jury focused on Chaffee's duty as an employee of the Bank and never reached the issue of the Bank's duty as principal. Ronald Barrett testified that before the merger was finalized Chaffee was concerned about the Pride loan and its affect on his career. Chaffee's personal stake in the success of the merger was emphasized in closing argument.

The liability of the principal for torts of the agent or employee is not always based upon the doctrine of respondeat superior. In fraud cases, a principal may be liable where he intentionally misinforms or withholds information from the agent and the agent thereupon innocently misrepresents. (Rest.2d Agency, § 256; 1 Witkin, Summary of Cal. Law (8th ed. 1973) Agency and Employment, § 153, p. 753.) Nor does the finding that Chaffee was not negligent preclude a finding of constructive fraud based on a breach of fiduciary duty by the Bank, Chaffee, or other officers and employees as the Bank's agent. Thus we conclude the failure to instruct on constructive fraud was prejudicial error requiring reversal.

## II

■ For guidance of the trial court on remand we explain the burden of proof for oral modification of a written contract is a preponderance of the evidence. (*Treadwell* v. *Nickel* (1924) 194 Cal. 243, 260 [228 P. 25]; see also *Liodas* v. *Sahadi* (1977) 19 Cal.3d 278, 289, fn. 6 [137 Cal.Rptr. 635, 562 P.2d 316].) We readily admit the court's error in requiring plaintiffs to prove the elements of oral modification by clear and convincing evidence is understandable. The Barretts' counsel requested the clear and convincing instruction based on their understanding of *Coldwell Banker & Co.* v. *Pepper Tree Office Center Associates* (1980) 106 Cal.App.3d 272 [165 Cal.Rptr.

---

[4] We note the absences of any request for instructions defining fiduciary duty in general and the fiduciary duty of banks in particular as these definitions relate to the Barretts' constructive fraud theory. However, the court's rejection of negligence instructions, including a definition of ordinary care may have been viewed as foreclosing this entire line of instructions.

51], a case decided by this division. *Coldwell Banker* relied on cases cited in 14 Cal.Jur.3d, Contracts, § 223, p. 506, for the proposition "[p]roof of every element of the oral agreement, as well as its execution, must be clear and convincing." These authorities misstate the law. We therefore disapprove of *Coldwell Banker* to the extent it can be read as requiring the burden of proof for oral modification of a written contract to be by clear and convincing evidence.

The error in earlier cases may be related to the split of authority on the question of standard of proof to be employed in civil actions for fraud, an issue explored in detail by the California Supreme Court in *Liodas*. That court observed fraud cases requiring proof by clear and convincing evidence involved actions for reformation or rescission of duly executed written instruments. "In light of the traditional reluctance of the courts to tamper with such documents, it is not surprising that a higher standard of proof than a mere preponderance of the evidence was thought to be appropriate." (*Liodas* v. *Sahadi, supra,* 19 Cal.3d at p. 287.)

■ The misstatement of law may simply reveal confusion in terminology between what has been described as the "quantum" of evidence required to support a finding of fraud—that it be a "preponderance"—and the "quality" of that evidence—that it be "clear and convincing." (See *Liodas* v. *Sahadi, supra,* 19 Cal.3d at p. 290.) However, the Supreme Court rejected this distinction. "There are no degrees of 'quality' of evidence in this state: no evidence is admissible except 'relevant' evidence. . . ." (*Ibid.*) ■ While the trier of fact must be satisfied based on admissible evidence that modification of a written instrument is intended, this in no way increases a plaintiff's burden of proof beyond the mere preponderance of the evidence required in most civil cases, including actions for fraud. (Evid. Code, § 115; *Liodas* v. *Sahadi, supra,* 19 Cal.3d at p. 291.)

## DISPOSITION

Judgment reversed.

Kremer, P. J., and Work, J., concurred.

A petition for a rehearing was denied August 19, 1986, and respondent's petition for review by the Supreme Court was denied November 26, 1986. Lucas, J., and Panelli, J., did not participate therein.