[No. D013448. Fourth Dist., Div. One. Apr. 23, 1991.]

PAUL COPESKY, Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
SAN DIEGO NATIONAL BANK, Real Party in Interest.

**COUNSEL**

Duke, Gerstel, Shearer & Bregante, Bryan R. Gerstel, John S. Huiskamp and Paul A. Zumberge for Petitioner.

No appearance for Respondent.

Miller, Boyko & Bell, Roy Morrow Bell and Gary D. Garcia for Real Party in Interest.

**OPINION**

**FROEHLICH, J.**—This petition seeks review of the sustaining without leave to amend of a demurrer to one cause of action of petitioner's complaint. The cause so terminated was entitled, and is properly characterized as, "Breach of the Implied Covenant of Good Faith and Fair Dealing." By means of this cause of action the petitioner sought to recover tort damages because of the real party in interest bank's wrongful cashing of checks drawn without proper signature. The allegations of the complaint were obviously drawn so as to bring the action within the rationale of this court's decision in *Commercial Cotton Co.* v. *United California Bank* (1985) 163 Cal.App.3d 511 [209 Cal.Rptr. 551] (hereinafter *Commercial Cotton*). In argument before the superior court, counsel for petitioner contended the case was controlled by *Commercial Cotton*, and indeed that his case was "a mirror image of *Commercial Cotton*."

The trial court responded "*Commercial Cotton* is flat out wrong. . . . I don't think our appellate court is going to uphold the decision they took in *Commercial Cotton* back in 1985. I don't think they would do that in this case." The principal category of argument in the petitioner's brief is entitled "The sole issue is whether *Commercial Cotton* remains viable." While this pithy characterization of the issue is perhaps more abbreviated than would become an appellate court, it accurately goes right to the point.

We believe this is one of those unusual cases in which writ review at the pleading stages is appropriate (see *Coulter v. Superior Court* (1978) 21 Cal.3d 144, 148 [145 Cal.Rptr. 534, 577 P.2d 669]), and therefore undertake the in-depth review of the *Commercial Cotton* principle referenced by petitioner. As will be seen below, we will agree with the trial court in concluding that certain propositions of law enunciated in *Commercial Cotton* are no longer viable (although we would not accept the argument that it was "flat out wrong," at least at the time of its determination).

### 1. *Factual and Procedural Background*[1]

Petitioner is an individual doing business as Torrey Pines Chiropractic Clinic. Petitioner maintained an ordinary commercial checking account with real party in interest bank. Checks from the account were authorized upon the signature only of petitioner or his wife. Over a period of some 18 months, from March 1987 through September 1988, a number of checks with forged signatures were presented to the bank; all checks were in denominations under $1,000. The forgeries were accomplished by petitioner's bookkeeper, using his signature stamp. Petitioner's failure to discover the forgeries over the period of 18 months was the result of the absence of his wife from the business for that period of time, the wife being the person who customarily supervised the bookkeeper's activities. The total of improperly withdrawn funds was $32,913.

The bank was negligent in cashing the checks by failing to require identification from the bookkeeper when the checks were presented, and also by accepting checks executed with a signature stamp rather than manual signature. Petitioner alleged that the checks constituted obvious forgeries which the bank reasonably should have noted. When petitioner reported the forgeries to the bank it refused to redeposit the lost funds, asserting a one-year statute of limitations on petitioner's claim as well as the contention that the bank had not been negligent in failing to discover the forgeries. Each of these defenses, petitioner contends, was without merit and constituted "stonewalling."

In addition to stating causes of action for breach of the contractual terms of the deposit agreement and for negligence, petitioner stated a "textbook" cause of action for "breach of the implied covenant of good faith and fair dealing."[2] The principal allegations of this cause of action are as follows:

---

[1] In that we review the sustaining of a demurrer, we accept the facts as set forth in the first amended complaint.

[2] As can be seen from our review of *Wallis v. Superior Court* (1984) 160 Cal.App.3d 1109, footnote 7 [207 Cal.Rptr. 123], the pleading tracks the several "factors" identified in *Wallis* which give rise to the "special relationship" affording relief in tort for breach of the implied

Petitioner and the bank, in entering upon the contract were in inherently unequal bargaining positions and the bank dictated the terms of the contract;

Petitioner's motivation for entering into the agreement was strictly non-profit and was to secure "peace of mind, security and protection of . . . funds;"

Ordinary contract damages would be inadequate;

Petitioner was particularly vulnerable because his funds were placed at the disposal of the bank, and a "special quasi-fiduciary relationship existed between [petitioner] and [bank]" which resulted in a duty of good faith and fair dealing;

This duty was breached when the bank refused to recredit the account but instead interposed "stonewalling" defenses without any reasonable belief in their validity;

This intentionally tortious action on the bank's part warrants the imposition of punitive damages.

A general demurrer was interposed only as to the "breach of the implied covenant" cause of action. As noted above, the demurrer was sustained without leave to amend, the court concluding that as a matter of law the bank-depositor contractual status revealed by the pleadings could not give rise to a relationship between the parties sufficient to support the tort cause of action for breach of the implied covenant.

### 2. *Revisitation of Commercial Cotton*

Since everyone involved in this case (the court below and all counsel) agree that its disposition depends upon the continued viability of the rule in *Commercial Cotton*, we are perhaps well advised at the outset to summarize that case. *Commercial Cotton* was decided by a unanimous panel of this court in 1985. As asserted by counsel for petitioner, the facts of *Commercial Cotton* bear considerable similarity to the facts of this case. The plaintiff, a commercial enterprise, maintained an ordinary checking account with de-

---

covenant of good faith and fair dealing. As such, the pleading is an excellent example of a statement of conclusions of law rather than allegations of fact, and no doubt would have been subject to a special demurrer. (See 4 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 332, pp. 381-383.) However, the attack on the complaint was by way of general demurrer, and both we and the trial judge therefore have passed over the rather obvious attempt to fit the individual facts of this case into a convenient mold of existing case precedent.

fendant bank. Some of the plaintiff's blank checks were lost, and the loss was reported to the bank. Later one of the checks was presented to the bank with forged signatures, and paid. When the loss was discovered some time later by the depositor, demand for repayment was made. The bank refused to cover the loss, relying upon the defense of the one-year statute of limitations as well as a claim of comparative negligence. (163 Cal.App.3d at p. 514.)

Unlike our case, *Commercial Cotton* went to trial, and the presentation to the appellate court was by way of ordinary appeal from a jury verdict in favor of the plaintiff. The portion of the appeal of interest to us is that which dealt with the breach of the covenant of good faith and fair dealing. The trial court permitted this claim to be presented to the jury, and the jury awarded $100,000 in punitive damages based thereon.

In its review of the factual background of the case, our court was particularly impressed with the shallow nature of the defenses asserted by the bank. Some eleven days before the final letter of denial from the bank's general counsel, the Supreme Court in *Sun 'N Sand, Inc.* v. *United California Bank* (1978) 21 Cal.3d 671, 699 [148 Cal.Rptr. 329, 582 P.2d 920] had specifically ruled that the three-year statute of limitations, rather than the one-year statute, was applicable for a claim such as that of *Commercial Cotton*.

Our court found it "inexplicable that [the bank's] general counsel could have been unaware of the Supreme Court's holding affecting the bank for which he was general counsel at the time he wrote the . . . letter." (*Commercial Cotton* 163 Cal.App.3d at p. 515.) Our court also found the contention of contributory negligence on the part of the depositor to be spurious, since whatever negligence was involved in failing promptly to note the forged check when it was returned to the depositor had no causal relationship to its original negligent cashing. It is fair to say, therefore, that our court regarded the bank's refusal to reimburse its depositor and its continued assertions of spurious defenses, right through a jury trial and to appeal, as an example of the most egregious of "stonewalling" tactics. Although not mentioned in the opinion, the fact that the dispute involved a mere $4,000 adds practical argument to the conclusion that the bank's position was completely unreasonable.

In its discussion of the tort of breach of the covenant of good faith and fair dealing, the *Commercial Cotton* court acknowledged the contention that the tort existed, outside the insurance context, only as to parties in a "special relationship." It cited *Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 820 [169 Cal.Rptr. 691, 620 P.2d 141] (hereinafter *Egan*) for

the proposition that this relationship (at least in the insurance context) is characterized by "elements of public interest, adhesion, and fiduciary responsibility." (*Commercial Cotton, supra,* 163 Cal.App.3d at p. 516.) It was noted that in the then very recent *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752 [206 Cal.Rptr. 354, 686 P.2d 1158] (hereinafter *Seaman's*), the Supreme Court had found it unnecessary to determine how far, if at all, the doctrine should extend to ordinary commercial contracts.

The court then ventured into what the Supreme Court had identified as uncharted seas, and found that the assertion by the bank of spurious defenses to the claim was an "unjustifiable, stonewalling effort to prevent an innocent depositor from recovering money," and constituted evidence adequate to support a jury finding of tortious breach of the covenant. (*Commercial Cotton, supra,* 163 Cal.App.3d at p. 516.)

The court reached the conclusion that the tort in question, originating in insurance relationships, could be applied in a banking context because "banking and insurance have much in common, both being highly regulated industries performing vital public services substantially affecting the public welfare." (*Commercial Cotton, supra,* 163 Cal.App.3d at p. 516.) The court then went on to publish the famous quote, much discussed and disputed thereafter, that "The relationship of bank to depositor is at least quasi-fiduciary."[3] This statement rounded out the three findings posited in the *Egan* formula for imposition of the special duty: (1) elements of public interest, (2) adhesion contractual relationship, and (3) fiduciary responsibility.

---

[3] The complete statement of the court is set forth as follows: "Analogizing to the factors set out in *Egan* we agree with [plaintiff's] contention that banking and insurance have much in common, both being highly regulated industries performing vital public services substantially affecting the public welfare. A depositor in a noninterest-bearing checking account, except for state or federal regulatory oversight, is totally dependent on the banking institution to which it entrusts deposited funds and depends on the bank's honesty and expertise to protect them. While banks do provide services for the depositor by way of monitoring deposits and withdrawals, they do so for the very commercial purpose of making money by using the deposited funds. The depositor allows the bank to use those funds in exchange for the convenience of not having to conduct transactions in cash and the concomitant security in having the bank safeguard them. The relationship of bank to depositor is at least quasi-fiduciary, and depositors reasonably expect a bank not to claim nonexistent legal defenses to avoid reimbursement when the bank negligently disburses the entrusted funds. Here, [defendant bank's counsel] claimed defenses are spurious, and the jury found experienced legal counsel interposing them in an unjustifiable, stonewalling effort to prevent an innocent depositor from recovering money entrusted to and lost through the bank's own negligence, is a breach of the bank's covenant of good faith and fair dealing with its depositor. Viewing the evidence in a light most favorable to the verdict, we hold it is overwhelmingly supported by the evidence." (163 Cal.App.3d at p. 516.)

Our digest of the rule of *Commercial Cotton* might be stated as follows: The ordinary relationship between commercial bank and its depositor is such as to impose upon the bank a duty, derived from the obligation of good faith and fair dealing implied in all contracts, to refrain from intentional breaches of contract and from interjection of spurious and bad faith defenses to contract claims, which duty if breached will give rise to an action in tort with attendant entitlement to punitive damages.

3. *Evolution of the Tort of Breach of the Obligation of Good Faith and Fair Dealing*

(a) *Early Development in Insurance and Wrongful Termination Cases*

In order to weigh the current value of the rule of *Commercial Cotton* we are required to review the history and evolution of the tort therein described. We do so briefly, recognizing that this is a field several times previously plowed by other jurists and by academics (some of which are cited hereunder) and hence neither merits nor requires extended comment here.

■ The existence of implied covenants of good faith and fair dealing in all contracts has long been the law. As stated in *Universal Sales Corp.* v. *Cal. etc. Mfg. Co.* (1942) 20 Cal.2d 751, 771 [128 P.2d 665]: "In every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing."

Reliance upon the covenant to support damages in excess of ordinary contract damages first arose in the insurance context. Initially supporting damages in excess of policy limits for wrongful refusal to settle a claim (*Comunale* v. *Traders & General Ins. Co* (1958) 50 Cal.2d 654 [328 P.2d 198, 68 A.L.R.2d 883]; *Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425 [58 Cal.Rptr. 13, 426 P.2d 173]), the concept was later expanded to embrace general tort damages for bad faith refusal to pay a claim (*Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 575 [108 Cal.Rptr. 480, 510 P.2d 1032]). The rationale for imposing tort liability in the insurance context was explained and justified in *Egan*. Emphasized were the nonprofit objectives of the insured in seeking protection and peace of mind (24 Cal.3d at p. 819), that insurance companies provided vital services quasi-public in nature (*id.* at p. 820) and that the insurance relationship had a fiduciary quality (*ibid.*).[4]

---

[4]For a discussion of the background of commercial bad faith cases see Putz & Klippen, *Commercial Bad Faith: Attorney Fees—Not Tort Liability—Is the Remedy for "Stonewalling"* (1987) 21 U.S.F. L.Rev. 419, 429 et seq.; see also the extended historical review of the tort by

The other arena in which recovery in tort for breach of the covenant of good faith and fair dealing was sanctioned, pre-*Seaman's*, was that of employment termination. *Cleary* v. *American Airlines, Inc.* (1980) 111 Cal.App.3d 443 [168 Cal.Rptr. 722] is a clear statement of the proposition that an implied covenant of continued employment can be found in certain otherwise undefined employment circumstances, and that a breach of this covenant by a discharge without cause can give rise to tort damages. (*Id.* at pp. 454-456.)[5]

(b) *The Impact of Seaman's*

The feasibility of using tortious breach of the covenant theories in cases other than insurance and wrongful termination of employment was given a boost by *Seaman's*. Seaman's had entered into a long term lease with the City of Eureka for the operation of a marine fueling station. This action was taken in reliance upon a contract for the purchase of fuel from Standard Oil Co. Subsequently, because of a changed economic climate, Standard Oil ceased supplying Seaman's. The resulting lawsuit included an action in tort for breach of the implied covenant which culminated in very large jury awards of both compensatory and punitive damages.

The Supreme Court characterized the principal issue of the appeal as "whether, and under what circumstances, a breach of the implied covenant of good faith and fair dealing in a commercial contract may give rise to an action in tort." (*Seaman's, supra,* 36 Cal.3d at p. 767.) The court noted that in prior decisions upholding the tort in insurance cases "we have emphasized the 'special relationship' between insurer and insured, characterized by elements of public interest, adhesion, and fiduciary responsibility." (*Id.* at pp. 768, 769, citing *Egan.*) The opinion then continued with the statement that "No doubt there are other relationships with similar characteristics and deserving of similar legal treatment," referring in a footnote to the employment termination cases illustrated by *Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 179 [164 Cal.Rptr. 839, 610 P.2d 1330]. (*Seaman's, supra,* 36 Cal.3d at p. 769, fn. 6.) The court cautioned, however, that consideration of the tort remedy in the ordinary commercial context was a move "into largely uncharted and potentially dangerous waters," but concluded by advising "This is not to say that tort remedies have no place in such a commercial context, . . ." (*Id.* at p. 769.)

All this discussion was, however, dictum. The court found it not necessary to predicate liability on breach of the implied covenant because it

Justice Croskey in *Careau & Co.* v. *Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1392 et seq. [272 Cal.Rptr. 387].

[5]See other employment termination cases cited in Putz and Klippen, *op. cit. supra*, at page 448, footnote 120.

identified a new tort in the intentional and bad faith denial of the existence of a contract. There is no question, however, that the *Seaman's* dictum stimulated academic and professional interest in extensions of the tort.[6] Justice Kaus, referring to *Seaman's*, stated "there is tremendous pressure on the courts, particularly this court, to extend bad faith liability to contractual relationships [other than the insurance relationship]." (*White* v. *Western Title Ins. Co.* (1985) 40 Cal.3d 870, 900 [221 Cal.Rptr. 509, 710 P.2d 309].)

Interpretation of the evident direction of the law on "bad faith" can best be seen by the reaction of the several Courts of Appeal. Our court in *Commercial Cotton* was one of the first to suggest expansion—into the field of commercial banking. Definitive direction in analyzing the concept of the "special relationship" was provided in *Wallis* v. *Superior Court* (1984) 160 Cal.App.3d 1109 [207 Cal.Rptr. 123] (hereinafter *Wallis*). Since the case arose from the peremptory termination by an employer of previously agreed-upon termination benefits, the case could be considered as part of the wrongful termination line of cases. The court's identification of factors leading to a determination of "special relationship" was not at all limited by employment concepts, however. The "similar characteristics" which would signal the existence of a "special relationship" could be found in almost any "special" kind of commercial contractual relationship.[7]

Rather than rushing to expand the tort, however, most courts followed the *Seaman's* admonition to "proceed with caution." (*Seaman's, supra,* 163 Cal.App.3d at p. 769.) *Quigley* v. *Pet, Inc.* (1984) 162 Cal.App.3d 877, 892 [208 Cal.Rptr. 394] denied application of the tort remedy in a breach of contract for the hauling of walnuts, finding a lack of the elements of "public interest, adhesion and fiduciary responsibility." *Gomez* v. *Volkswagen of*

---

[6]See, e.g., Putz and Klippen, *op. cit. supra*; and Traynor, *Bad Faith Breach of a Commercial Contract: A Comment on the Seaman's Case* (1984) 8 Bus. L.News 1. Professor Eric Wright stated: "Once the concept of good faith and fair dealing was found to be a part of the insurance contract, it did not take long until attorneys were asserting that such a covenant must also logically be a part of other types of contracts. Following what appeared to be the obvious lead of the California Supreme Court [(citing *Seaman's*)], lower courts began extending the concept of good faith to other types of contracts. . . ." (Symposium, *Bad Faith and Punitive Damages* (1989) 29 Santa Clara L.Rev. 546, fn. omitted.) All scholarly comment on *Seaman's* has not, however, been complimentary. Federal Circuit Court Justice Kozinski wrote "In inventing the tort of bad faith denial of a contract [in *Seaman's*] the California Supreme Court has created a cause of action so nebulous in outline and so unpredictable in application that it more resembles a brick thrown from a third story window than a rule of law." (*Oki America, Inc.* v. *Microtech Intern., Inc.* (9th Cir. 1989) 872 F.2d 312, 315.)

[7]The *Wallis* court stated that the "similar characteristics" which must be present to permit tort liability were (1) inherently unequal bargaining positions; (2) nonprofit motivation, i.e., objective of securing peace of mind, security; (3) inadequacy of ordinary contract damages; (4) special vulnerability of one party to harm as a result of breach of trust of the other; and (5) awareness by the other of this special vulnerability. (*Wallis,* 160 Cal.App.3d at p. 1118.)

*America, Inc.* (1985) 169 Cal.App.3d 921 [215 Cal.Rptr. 507] refused to consider application of the tort to an action by a consumer against an auto manufacturer. *Martin* v. *U-Haul Co. of Fresno* (1988) 204 Cal.App.3d 396 [251 Cal.Rptr. 17] refused to find a "special relationship" in the franchise agreement between the U-Haul company and one of its franchisees. *Rogoff* v. *Grabowski* (1988) 200 Cal.App.3d 624 [246 Cal.Rptr. 185], weighing and applying the *Wallis* criteria, held no "special relationship" existed between a limousine company and its patrons. The federal courts also declined to extend factual situations in which a "special relationship" could be found. (See *Premier Wine & Spirits* v. *E. & J. Gallo Winery* (E.D.Cal. 1986) 644 F.Supp. 1431; *Elxsi* v. *Kukje America Corp.* (N.D.Cal. 1987) 672 F.Supp. 1294; *Standard Wire & Cable Co.* v. *Ameritrust Corp.* (C.D.Cal. 1988) 697 F.Supp. 368.)

Reaction to this court's decision in *Commercial Cotton*, at this time, was mixed. While it was criticized in student comments in two law reviews,[8] it received uncritical review by more prestigious authors.[9] It was cited without criticism in *Gomez* v. *Volkswagen of America, Inc.*, *supra*, 169 Cal.App.3d 921; *Rogoff* v. *Grabowski, supra*, 200 Cal.App.3d 624; *Martin* v. *U-Haul Co. of Fresno, supra*, 204 Cal.App.3d 396; *Multiplex Ins. Agency, Inc.* v. *California Life Ins. Co.* (1987) 189 Cal.App.3d 925 [235 Cal.Rptr. 12]; and expressly followed by the same appellate court in *Barrett* v. *Bank of America* (1986) 183 Cal.App.3d 1362 [229 Cal.Rptr. 16]. Absent a drastic change in the Supreme Court's direction, which we note hereunder, the philosophy and trend of *Commercial Cotton* might still be healthy.

### (c) A Change of Direction: Foley

The winds of change blew in 1988 with the publication of *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373] (hereinafter *Foley*). A reconstituted Supreme Court (only two of the seven justices participating in *Foley* took part in the *Seaman's* decision) took a completely new look at the "implied covenant of good faith and fair dealing." The court emphasized the difference between contract and tort remedies, affirming that in the usual case only contract remedies are available for breach of the contractual implied covenant. The court recognized the exception to this general rule developed in the context of insurance contracts,

---

[8] Comment, *The Fiduciary Controversy: Injection of Fiduciary Principles Into the Bank-Depositor and Bank-Borrower Relationships* (1987) 20 Loyola L.A. L.Rev. 795; Comment, *Commercial Cotton Co.* v. *United California Bank: California's Newest Extension of Bad Faith Litigation Into Commercial Law* (1986) 16 Sw.U.L.Rev. 645.

[9] Putz and Klippen, *op.cit. supra*, 21 U.S.F. L.Rev. at pages 462-465, footnote 178. This footnote reviews the subsequent history of the case, and, interestingly, points out that the California Supreme Court declined either to depublish or accept the case for review even though it received extensive amicus briefs in support of United California Bank's petition from six leading California banks and the California Bankers' Association.

citing and referring to the principles contained in *Comunale* v. *Traders & General Ins. Co, supra,* 50 Cal.2d 654; *Egan,* and *Gruenberg* v. *Aetna Ins. Co., supra,* 9 Cal.3d 566. (*Foley, supra,* 47 Cal.3d at p. 684.) ▪ ▪ ▪

▪ The court referred to the "special relationship" test "gleaned from the insurance context" (*id.* at p. 690) and discussed scholarly treatises which had argued either for or against the extension of tort damages into fields other than insurance upon measurement of the extent to which the "special relationship" could be established in such other commercial contexts.[10] The court then concluded that there was insufficient basis for extending the special tort relief available in insurance cases to the employment field, stating "the need to extend the special relationship model in the form of judicially created relief of the kind sought here is less compelling." (*Foley, supra,* 47 Cal.3d at p. 693.) Also, "we are not convinced that a 'special relationship' analogous to that between insurer and insured should be deemed to exist in the usual employment relationship." (*Id.* at p. 692.) Referring to the statement in *Seaman's* that " 'No doubt there are other relationships with similar characteristics and deserving of similar legal treatment' " (*Foley, supra,* at p. 687), the majority denied that it was a signal of approval of extended tort remedies, stating "If anything, the reference highlighted the fact that this question remained to be decided by this court." (*Id.* at p. 688, fn. 27.)

### 4. *Present Status of the Tort of Bad Faith Breach of the Covenant in the Banking Context: Application to This Case*

There is no question but that the decision in *Foley* redirects the course of law in the area of tort recovery for breach of commercial contracts. While some may argue that the *Seaman's* tort of bad faith denial of the *existence* of a contract remains viable, few would contend that new broad categories of business relationships remain to be identified by the *Wallis* test as presumptively amenable to tort remedies for contract breach. Before *Foley,* one could confidently suggest that at least in two spheres of contract relation-

---

[10] The court took notice of the *Wallis* case and discussed it in terms of its having recognized the existence of a tort remedy "in employment relationships within the stated limitations." (*Foley, supra,* 47 Cal.3d at p. 691.) In an extended footnote the court then recited the several factors established in *Wallis* as determinative of the existence of the special relationship. (*Id.,* fn. 29.) The court went on to conclude, on the next page of the text, that the insurance-created concept of "special relationship" should not be deemed to exist in the usual employment relationship. (*Foley, supra,* at p. 692.) From the order of arrangement of the opinion, it might be interpreted as rejecting the *Wallis* test for special relationship. We find this conclusion difficult to accept, however. In specifically citing and making detailed reference to the *Wallis* factors the Supreme Court appears to recognize the same as established precedent. Had *Wallis* been deemed erroneous it would have been most expedient to have so stated. Lacking any suggestion of disapproval, we conclude that the *Wallis* factors for determining "special relationship" remain viable, even if having perhaps little utility in the ordinary employment relationship.

ships—insurance contracts and long-term employment agreements—a bad faith breach could give rise to tort damages. ■ That assumption is now gone; there is only *one* category of business transactions which definitionally is amenable to tort actions for contract breaches, and that is insurance.

The *Foley* decision did not reference commercial banking activities nor did it cite *Commercial Cotton*. ■ We are most satisfied, however, that if the *Foley* court were to apply the same reasoning to the commercial banking business which it applied to employment contracts it would conclude that, in the usual case, the "special relationship" found in insurance cases and evaluated by the *Wallis* standards would be lacking.

Post-*Foley* Court of Appeal decisions would appear to agree with this conclusion. Our own court, in an opinion written by the same justice who authored *Commercial Cotton*, in *Mitsui Manufacturers Bank* v. *Superior Court* (1989) 212 Cal.App.3d 726, 729 [260 Cal.Rptr. 793], stated: "We reject real parties' argument that the tort doctrine which has been extended only to situations where there are unique fiduciary-like relationships between the parties, should encompass normal commercial banking transactions." In an extended and scholarly opinion the court in *Careau & Co.* v. *Security Pacific Business Credit, Inc.*, *supra*, 222 Cal.App.3d 1371 found no "special relationship" to exist in the bank-borrower situation. (See also *Lee* v. *Bank of America* (1990) 218 Cal.App.3d 914 [267 Cal.Rptr. 287].)

The most directly applicable current authority is *Price* v. *Wells Fargo Bank* (1989) 213 Cal.App.3d 465 [261 Cal.Rptr. 735] (hereinafter *Price*). In that case an action was brought against the bank by a commercial borrower, who complained that the bank's refusal to extend the terms of loans caused forced liquidation of assets and financial loss. One of the principal causes of action (dismissed on summary judgment by the trial court) was an action in tort for breach of the implied covenant, brought specifically in reliance upon the authority of *Commercial Cotton*. The court rejected the decision and reasoning of *Commercial Cotton*, declined seriously to attempt application of the *Wallis* factors to the case, and held rather simply that no contractual implication can be made in a bank's lending contract which precludes it from foreclosing in accordance with the terms of the contract. Referring to *Foley*, the *Price* court stated that "The impact of the *Foley* decision cannot be assessed with certainty [but] [t]he decision surely precludes the sort of loose extension of tort recovery, based on 'quasi-fiduciary' relationship, sanctioned in [*Commercial Cotton*] . . . ." (*Price, supra,* 213 Cal.App.3d at p. 478.)[11]

---

[11] We do note, however, that the reasoning of *Commercial Cotton* has not been unanimously rejected. Justice Johnson, dissenting in *Lee* v. *Bank of America*, *supra*, 218 Cal.App.3d at page 921, would affirm the continued vitality of *Commercial Cotton*. His analysis of the *Wallis* five points results in the conclusion that they fit the bank-depositor relationship, thus con-

Coming finally to the facts of our case: We must conclude that the application of the *Wallis* five points does not indicate a "special relationship," and hence an action in tort by the depositor cannot be stated for simple breach of the deposit contract.[12] Looking to the *Wallis* criteria, we believe that a commercial entity and a bank are not ordinarily in inherently unequal bargaining positions. There is nothing in these pleadings, nor is there any aspect of common banking transactions, which suggests to us that banks in general are, or this bank in particular was, in a superior bargaining position. Banks in our society are commonly most competitive. That the bank offers a standard product certainly cannot make its bargaining position "unequal."

Referring to the second *Wallis* criterion, the motivation for entering into the contract, we can conceive of very few contracts which are more profit-oriented than the commercial bank account of a chiropractor. Obviously one chooses a bank in which to deposit his money in part because of the apparent security of the institution; this does not mean, however, that the motivation for the transaction is "peace of mind" in the sense that such motivation inheres in an insurance contract.[13]

The third *Wallis* factor relates to damages. It is true that damages to be recovered for suing a bank for cashing a forged check may be inadequate. This is not because of anything special about banks or commercial deposits, however. The problem with suing banks is the same problem that besets the typical judicial remedy for all commercial breaches. Unless one has included an attorney fee clause in the contract, recovery of the fees and practical costs of litigation is not possible. No one, therefore, involved in commercial litigation these days can be made completely whole. *Wallis* was not talking about this defect in our jurisprudential system—it had to do instead with

stituting it a "special relationship" appropriate for utilization of tort claims when the deposit contract is breached. We respectfully disagree with Justice Johnson's approach, as seen *infra*.

[12] We, of course, are not saying that a bank may not under special circumstances undertake obligations which bring it into a "special relationship" with a customer. Many banks affirmatively offer trust and other specifically fiduciary services, and as such are in a position to do great harm if the trust agreement is broken in bad faith. We refer in our text, *ante*, simply to the ordinary bank-depositor relationship (and presumably, although it would be dictum, also to the ordinary bank-borrower relationship).

[13] We follow, here, the line of reasoning developed in *Foley, supra*, 47 Cal.3d at pages 692-693. The employment relation was distinguished from the insurance relation by noting the unique economic dilemma faced by the insured whose insurer refuses in bad faith to pay policy benefits. The insured has lost the very benefit for which he contracted, and is not in a position to seek alternative relief from competitors. The employee, however, has not bargained for any similar type of "protection," and the breach of the employment contract causes damages essentially similar to those resulting from breaches of other kinds of contractual agreements—such as the refusal to honor a contract for the supply of goods vital to a small dealer's business. We conclude that the breach of a banker's agreement with its depositor similarly results in damage typical to all commercial contracts.

the peculiar loss associated with denial of payment of insurance proceeds or, as in *Wallis*, the peremptory interruption of monthly termination payments to an aged retired employee.

The fourth and fifth *Wallis* criteria identify special vulnerability of one party of which the other party is aware. One can posit unusual banking arrangements whereby minors or other dependent people specifically inform the bank of their complete dependence upon the liquidity of their bank account, in which case these criteria might be satisfied. The ordinary bank checking account is not, however, of this nature. We note in this case that the account was so fluid its owners did not notice the theft of some $32,000 for over a period of 18 months. Anyone who has lost money because of breach of a commercial obligation is going to consider himself damaged, and the continuing state of loss causes such person to experience a certain feeling of vulnerability. As with the damage issue, however, this is a problem common to all commercial transactions, not different in the typical bank-depositor transaction, and certainly not the sort of vulnerability envisaged by the *Wallis* criteria.

We should refer also to the specific factors cited in *Commercial Cotton* as promotive of treating the banking industry the same as the insurance industry in terms of the implied covenant tort applicability. The *Commercial Cotton* court did not utilize the *Wallis* factors, but instead relied upon those factors stated in *Egan* and *Seaman's*: public interest, adhesion, and fiduciary responsibility. We have discounted, above, the concept that the deposit contract is an adhesion contract. We have serious doubts that the status of banking as an industry important to the public welfare should have an effect upon the issue before us. As noted in Comment, *Fiduciary Controversy: Injection of Fiduciary Principles Into the Bank-Depositor and Bank-Borrower Relationship, supra*, 20 Loyola L.A. L.Rev. at pages 816-817, "The concept of 'affected with the public interest' can be applied to common carriers, theaters, restaurants, inns/motels, food retailers, garbage collectors, doctors and landlords. The list is virtually endless. Therefore, it would be absurd to single out banks as having a "special relationship" with its customers merely because banking is 'affected with the public interest.'" (Fns. omitted.)

Of most concern, however, is the statement made in *Commercial Cotton, supra,* 163 Cal.App.3d at page 516 that "[t]he relationship of bank to [its] depositor is at least quasi-fiduciary." This statement is severely criticized in *Price* at page 476, and its assertion countered by the citation of well-established authority for the proposition that the relationship between a bank and its depositor is *not* a fiduciary relationship, but that of debtor-creditor. (*Morse* v. *Crocker National Bank* (1983) 142 Cal.App.3d 228, 232 [190 Cal.Rptr. 839]; *Downey* v. *Humphreys* (1951) 102 Cal.App.2d 323, 332 [227 P.2d 484], and a case contemporaneous with *Commercial Cotton*: *Lawrence*

v. *Bank of America* (1985) 163 Cal.App.3d 431 [209 Cal.Rptr. 541].) We note that the statement in *Commercial Cotton* was made without benefit of citation of authority. Presuming that the court was aware of *Morse* v. *Crocker National Bank, supra, Downey* v. *Humphreys, supra,* and other authorities which had established the bank-depositor relationship as merely debtor-creditor, and that the *Commercial Cotton* court did *not* purport to classify the relationship actually as "fiduciary," we are led to a search for what might have been meant by the phrase "quasi-fiduciary." In Garner, A Dictionary of Modern Legal Usage (1987) page 457, "quasi" is defined as "seeming or seemingly; in the nature of; nearly," and its use demeaned by a quote from 1 Corbin on Contracts (1963 ed.) section 19, pages 45-46 that "the term *quasi* is introduced as a weasel word that sucks all the meaning of the word that follows it." (Italics in original.)

We conclude both from the manner of use and the omission of any citation that when the court in *Commercial Cotton* used "quasi-fiduciary" it intended *not* to question prior authority establishing that banks in ordinary deposit relationships are not fiduciaries, but sought only a shorthand phrase to describe attributes in the relationship which are similar to *some* of the attributes of a true fiduciary relationship. ■ The court was, simply, grappling with the criteria described in *Egan* and *Seaman's* (elements of public interest, adhesion and fiduciary responsibility) for establishing "special relationship," and noting that some contractual features of a banking relationship establish elements of reliance and trust which "seem like" or are "in the nature of" (to refer to our dictionary definition) obligations resulting from a true fiduciary relationship.[14]

In light of the reasoning of *Foley*, we are convinced *Commercial Cotton*'s characterization of a bank-depositor relationship as quasi-fiduciary is now inappropriate. While some aspects of that relationship may resemble aspects of the insurer-insured relationship, there are equally marked differences

---

[14] We have had occasion in other circumstances to examine the loose characterization of relationships as fiduciary, quasi-fiduciary or fiduciary like, and have concluded such are both unhelpful and fraught with analytic pitfalls. Thus, we noted in *Love* v. *Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136, 1148-1149 [271 Cal.Rptr. 246], that particular contractual obligations, specifically undertaken in contracts such as those executed by insurance companies, can impose certain duties resembling the duties which burden true fiduciaries. This resemblance does not, however, make the insurance company a *true* fiduciary with all of its attendant obligations. While a bank's role as deposit keeper may resemble an insurer in some aspects, the bank is in no sense a true fiduciary. It deals at arm's length and in commercial independence with its depositor. It is not obligated to put the interests of the depositor above its own, and is not required to disregard the interest of its shareholders when evaluating claims made upon it by depositors. Just as it was imprudent in *Love, supra,* to simply label an insurer a "quasi-fiduciary" (since such a characterization carries the analytic danger that such labeling could lead to "import[ing] uncritically the entire cargo of fiduciary obligations into the port of insurance law" (*ibid.*), so too we perceive equivalent dangers attend an automatic extension of "quasi-fiduciary" status to ordinary bank-depositor relationships.

between those relationships. Since appending the quasi-fiduciary label to the ordinary bank-depositor relationship runs counter to both pre- and post-*Commercial Cotton* authority, and such a label provides no analytical framework against which to evaluate (after *Foley*) the propriety of extending tort remedies for contractual breaches, we no longer approve the denomination of the ordinary bank-depositor relationship as quasi-fiduciary in character.

### 5. *Conclusion and Disposition*

It is thus our conclusion that banks, in general and in this case, are not fiduciaries for their depositors; and that the bank-depositor relationship is not a "special relationship" under the *Wallis* test, or any other test, such as to give rise to tort damages when an implied contractual covenant of good faith is broken. We are therefore forced to acknowledge that our decision in *Commercial Cotton*, while in its time seemingly in harmony with the direction of the Supreme Court, turned out, after *Foley*, to be misdirected. We acknowledge the accuracy of *Price*, and *Careau & Co.* v. *Security Pacific Business Credit, Inc.*, *supra*, 222 Cal.App.3d 1371 in their characterization of the ordinary bank-customer relationship as *not* a special relationship giving rise to tort remedies when the bank unreasonably, and even in bad faith, denies liability on a contract or interposes spurious defenses. The third cause of action in this case, therefore, was defective and the trial court was correct in sustaining the general demurrer to it. The petition is denied. Real party in interest is entitled to costs. (*Union Trust Co.* v. *Superior Court* (1939) 13 Cal.2d 541, 543 [90 P.2d 582].)

Benke, Acting P. J., and Huffman, J., concurred.

Petitioner's application for review by the Supreme Court was denied July 25, 1991. Mosk, J., was of the opinion that the application should be granted.