Filed 6/20/22  Silvester v. Estate of Niparko CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| DOMINIC SILVESTER, | B301926 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC574789) |
| v. | |
| ESTATE OF JOHN KIM NIPARKO et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Holly J. Fujie, Judge.  Reversed and remanded.

Dentons US LLP, Ronald D. Kent, Michael J. Duvall, Susan M. Walker, for Plaintiff and Appellant.

Berkes Crane Robinson & Seal LLP, Robert H. Berkes, Steven M. Crane, Steven M. Haskell, for Defendants and Respondents.

———————————

**INTRODUCTION**

Appellant Dominic Silvester is a former patient of physician John Kim Niparko, an ear specialist who treated Silvester over several months for tinnitus (ringing in his ears). Silvester contends that while he was in a vulnerable state during treatment, Dr. Niparko, now deceased, improperly solicited Silvester to make charitable donations to Johns Hopkins Hospital. Silvester further asserts Niparko concealed that Silvester's condition had worsened under Niparko's care because Niparko wanted Silvester to continue donating large sums of money.

Silvester sued Niparko's estate and the personal representative of Niparko's estate for fraud and constructive fraud. After an eight-day trial, the jury entered a general verdict in favor of the personal representative. Silvester appeals the judgment on numerous grounds, including the trial court's refusal to give a constructive fraud jury instruction requested by Silvester, several evidentiary rulings made by the trial court and the summary adjudication order precluding Silvester's punitive damages claim, which he contended was limited to the estate's insurance policy limits. We conclude that although there was no instructional error, evidentiary error by the trial court requires a new trial, and we reverse.

**FACTUAL AND PROCEDURAL BACKGROUND**

*1. Niparko Begins To Treat Silvester for Tinnitus*

Silvester is the CEO and founder of Enstar Group, a publicly-traded international insurance company. In 2010, he

2

was 50 years old and resided in Cape Town, South Africa.[1] Niparko was an otolaryngologist (ear, nose and throat specialist) sub-specializing in diseases of the ear. In 2010 Niparko was a professor and interim chair of the Department of Otolaryngology at Johns Hopkins Hospital in Baltimore, Maryland.

In October 2010, Silvester began experiencing persistent ringing in his ears. A general practitioner diagnosed him with post-viral tinnitus. On November 4, 2010, Silvester traveled to Johns Hopkins for a previously-scheduled "executive physical"—a concierge service provided by Johns Hopkins for busy executives who need to coordinate multiple tests and examinations. While there, Silvester conferred with Niparko and another otolaryngologist, Dr. Agrawal, who both concurred with the diagnosis of post-viral tinnitus and prescribed an over-the-counter nasal decongestant. Silvester emailed Niparko and Agrawal several times in November 2010 with concerns and questions about his condition and asked Niparko to be his primary medical provider.

Johns Hopkins identified Silvester as a potential donor with an "extremely large" financial capacity, and Niparko provided one of Silvester's emails to the principal development officer of Johns Hopkins' Department of Otolaryngology for the department's donor list.

In December 2010, Silvester returned to Johns Hopkins to see Niparko about his continuing tinnitus. Niparko recommended Silvester regularly use steroid dexamethasone drops in his middle ear via grommet tubes that would be placed in his eardrums. Silvester underwent a procedure to have the

---

[1]    He also maintained residences in England, Bermuda, Dublin, New York City and Aspen, Colorado.

3

grommet tubes placed in his ears. His wife and a doctor in Cape Town assisted him with administering the dexamethasone drops.

2. *Silvester Pledges a Charitable Donation to Johns Hopkins and Makes an Initial Payment*

In December 2010 Silvester sent Niparko two cases of wine. Niparko responded by email thanking him and asked if Silvester would consider making "a tax-deductible, charitable contribution to help support our work. We want to offer more effective treatments of inner-ear disease."

James Kelley, principal development officer for the Johns Hopkins Otolaryngology Department, spoke with Silvester about making a philanthropic donation to the Department. On December 18, 2010, Silvester wrote to Niparko: "I am 100% committed to supporting your work. . . . When I reflect on the work you and your colleagues do, it makes me feel quite unfulfilled in what I have done. . . . Jamie provided me with a document on the research you do and the funds needed. I have already spoken with our CFO on how the company can make tax efficient donations but I will donate personally as well . . . it will be my absolute pleasure to support you and your work. Actions always speak louder than words and you will see action!" Silvester added that the tinnitus was the "most traumatic thing that ha[d] ever happened to [him]" and that he had "hit depths of despair on a few occasions over the past few months that [he] never thought was possible for [him]." Niparko responded: "We would be honored to partner with you on our research programs, but know that getting your present symptoms addressed is our first priority. Let's focus on that right now." Niparko forwarded Silvester's email to Kelley, who responded, "Sounds like we've got some success coming in the future. Great job!"

4

On January 6, 2011, Silvester wrote to Niparko: "[T]hank you as always for your help and advice. I really enjoyed our conversation and thank you for your hospitality. You have my total 100% commitment to fund the $2.5 million dollars and I fully expect it will be more. Forget my ears, seeing you in action has opened my eyes to a number of things that I was blind to before." Silvester expressed that he felt "hugely appreciative" and "lucky" to have Niparko helping him at this time.

On January 10, 2011, Silvester entered into a donor agreement with Johns Hopkins to fund a chair for the Department of Otolaryngology for $2.5 million. Silvester then made what was supposed to be the first of seven annual $357,000 payments to Johns Hopkins.[2] On January 27, 2011, Silvester wrote to Niparko: "I now look upon it as one of my missions in life that I will help your funding and to further your research. My plan is that the funds for the chair that I have committed to already will be substantially increased."

3. *Niparko Performs Surgery on Silvester and Diagnoses Him With Wegener's Granulamotisis, and the Two Discuss Further Charitable Donations*

In the first quarter of 2011, Silvester returned to Niparko for dozens of treatments. By February 2011, the ringing in Silvester's left ear had subsided considerably. However, pus began draining from Silvester's right ear and his hearing in that ear—which had been his better-hearing ear—diminished. He was put on oral antibiotics in Cape Town and, on March 11, 2011, was treated at Johns Hopkins with intravenous antibiotics. The

---

[2] Silvester never made another payment or donation to Johns Hopkins or to Niparko.

apparent infection ceased but was replaced with an idiosyncratic, intractable inflammation in his right middle ear (polypoid disease), which did not respond to further antibiotics.

In early 2011, Niparko was a candidate to become permanent chair of the Department of Otolaryngology. During Silvester's visits to Johns Hopkins for treatment, he and Niparko regularly discussed Niparko's pending candidacy for department chair and strategized on how to direct Silvester's donations to Niparko's work. In March 2011, Niparko told Silvester he had not been promoted. Silvester responded that he had been awaiting Johns Hopkins' decision on Niparko's promotion to announce his plan to donate $10 million toward a program or facility directed by Niparko, regardless of location.

On March 16, 2011, Niparko performed a mastoidectomy of Silvester's right ear to surgically remove the inflammation. This surgery was ultimately repeated five more times because the inflammation did not subside and threatened to further diminish Silvester's hearing. Niparko also continued to treat Silvester with dexamethasone drops. Neither the surgery nor the injections improved Silvester's tinnitus or hearing loss. Niparko told Silvester the steroid injections were not the cause of his right ear problems.

In August 2011, Silvester wrote to Niparko and said he was thinking about potential places Niparko might practice if he left Johns Hopkins. Silvester also noted he had an idea for additional funding.

In late 2011, after consulting with other doctors at Johns Hopkins, Niparko told Silvester his condition might be due to Wegener's Granulamotisis, an uncommon autoimmune disease. In January 2012, Niparko consulted with rheumatologist

Dr. Philp Seo at Johns Hopkins. In February 2012, Seo began to treat Silvester with an anti-cancer drug, methotrexate, to restrain the inflammation.

In mid-January 2012, Niparko sent Silvester a proposal for an ear research institute that Niparko would oversee and which Silvester would fund. Niparko asked Silvester to send a letter supporting the proposed institute to Johns Hopkins' leadership; Niparko and his friend Nancy Mellon drafted the letter, which Silvester signed.

Between November 2010 and January 2013, Silvester consulted with and obtained second opinions from approximately a dozen other doctors around the world regarding his tinnitus, ear inflammation and treatment protocol. Niparko provided many of those physicians with copies of Silvester's medical records and information about his diagnosis and course of treatment. In February 2012, Silvester was referred to Dr. Subinoy Das, an ear, nose and throat doctor who had experience treating patients with Wegener's. Das concluded Silvester's condition was caused by an infection, not by Wegener's. Silvester spoke with Niparko about Das's opinion but decided to continue with Niparko's recommended course of treatment.

In April 2012, pathologist Dr. Edward McCarthy at Johns Hopkins identified a "vasculitis" in Silvester's middle ear tissue sample. Niparko concluded this finding confirmed a working diagnosis of atypical Wagener's. Niparko told Silvester, "Wegener's is notoriously difficult to diagnose—you do not have systemic Wegener's." Seo agreed that atypical Wegener's was a reasonable working diagnosis and prescribed cytoxin and prednisone instead of methotrexate, telling Silvester that this was the "big gun" treatment.

In August 2012, Silvester saw Dr. Gary Hoffman, a rheumatologist at the Cleveland Clinic, for a second opinion Niparko forwarded a summary of Silvester's medical records to Hoffman, who examined Silvester and conducted lab testing of his blood. Hoffman told Silvester he did not have Wegener's or any autoimmune disorder. On August 13, 2012, Silvester and Drs. Niparko, Hoffman, McCarthy, Seo and Brendan Venter (a Cape Town general practitioner and Silvester's personal friend) had a conference call. Hoffman opined the various surgeries had caused the vasculitis identified by McCarthy. Hoffman concluded Silvester did not have any form of Wegener's and advised that he should stop taking medication for it. Hoffman also discovered Silvester's mercury blood level was "alarmingly high" and informed Niparko that neurologic symptoms, including auditory impairment such as tinnitus, could result from mercury poisoning. Silvester's elevated mercury levels resulted from his "generous fish diet." He followed Hoffman's advice and underwent chelation therapy to rid himself of the mercury; Silvester's physical symptoms improved. By December 2012, Niparko concluded Silvester did not have Wegener's.

From December 2012 through January 2013, Silvester exchanged several emails with Niparko and asked for clarification regarding Niparko's treatment decisions and queried why Niparko's medical opinions differed from other opinions Silvester received.

In 2013, Silvester's right ear was repaired at Harvard Hospital, though he still suffers from a hearing impairment in that ear.

### 4. *Silvester Sues Johns Hopkins and Niparko*

On June 23, 2014, Silvester sued Johns Hopkins and its physicians and employees for medical negligence in Maryland state court. On March 6, 2015, Silvester filed the underlying action in the Los Angeles Superior Court for "fraud/deceit/concealment/misrepresentation" and constructive fraud against Niparko. On December 7, 2015, Silvester settled the Maryland action and released Johns Hopkins and its employees, including Niparko, from all medical negligence claims, though the settlement carved out the California fraud claims against Niparko. Two months later, Johns Hopkins wrote to Silvester that they were refunding him $357,143 and relieving him of any financial obligations for further donations. Silvester refused the return of his money to ensure he could obtain the documents he had subpoenaed.

Niparko died from cancer on April 25, 2016. On July 29, 2016, Silvester filed his second amended complaint against "the Estate of John Kim Niparko, Deceased." Pursuant to Probate Code sections 550 and 552 and Code of Civil Procedure section 9390, Silvester served the second amended complaint on MCIC Vermont LLC, Attorney-in-Fact for MCIC Vermont (a Reciprocal Risk Retention Group) (MCIC), the insurer providing the defense for Niparko before he died. MCIC thereafter appeared in the action as the "Estate."

Niparko's spouse, Angela Niparko, filed a probate case on July 29, 2016, and the court named her the personal representative of the estate. Silvester then filed his operative third amended complaint, which proceeded against both "the Estate of John Kim Niparko, Deceased," and "Angela Niparko, as

9

the Personal Representative of the Estate of John Kim Niparko, Deceased." Angela as the personal representative appealed.

On October 12, 2016, Silvester filed a claim against the estate in probate court, which Angela rejected. On January 11, 2017, the parties stipulated Silvester would not seek to recover punitive and/or exemplary damages from Angela.

The parties agreed to trifurcate the trial into phase I on liability and compensatory damages; then, if Silvester prevailed in phase I, phase II would involve Silvester's claim for punitive damages against the estate; and phase III would involve his claim against MCIC and/or any other insurers or indemnitors for insurance coverage or indemnification for any damages awarded.

### 5. *Summary Adjudication*

On March 9, 2018, the trial court issued its Order on Respondent's Motion for Summary Adjudication, holding, in part, that no punitive damages may be awarded against either Respondent or MCIC.

### 6. *Jury Trial and Verdict*

The court ruled on the parties' proposed jury instructions and motions in limine during pretrial hearings on November 27, 2018, May 15, 2019, and June 6, 2019.

The eight-day jury trial began on June 10, 2019. Respondent agreed to a general verdict form in exchange for Silvester's written agreement that he would not seek to execute on any estate assets other than insurance and indemnity protection.

The jury was instructed on three claims: constructive fraud, actual fraud by intentional misrepresentation, and actual fraud by concealment. The jury began deliberating on June 21, 2019,

and returned a unanimous general verdict in favor of Respondent the same day.

Judgment was entered on July 23, 2019. Silvester timely filed a motion for a new trial, which the court denied.

This appeal followed.

## DISCUSSION

1. *The Trial Court Did Not Err in Refusing To Give Silvester's Proposed Constructive Fraud Jury Instruction*

*a. Silvester's proposed constructive fraud instruction*

Silvester's primary contention on appeal is that the trial court erred in refusing to use the following constructive fraud jury instruction that he proposed before the final pre-trial hearing:

"Dominic Silvester claims that he was harmed because Dr. Niparko took advantage of their fiduciary (doctor-patient) relationship. To establish this claim, Dominic Silvester must prove the following:

1. a. Dominic Silvester was vulnerable, and

   b. Dr. Niparko took advantage of Dominic Silvester's vulnerability in soliciting money from him; or

2. Dr. Niparko misled Dominic Silvester by providing Dominic Silvester with inaccurate and/or incomplete information or by failing to disclose some or all of the information that: Dominic Silvester did not need the medical treatment he was receiving or that Dominic Silvester did not have the disease for which he was being treated, or that Dominic Silvester's medical treatment was harming and not helping him, or that Dr. Niparko's treatment had caused Dominic Silvester harm, or

11

that Dr. Niparko was not acting in Dominic Silvester's best interests;

3. Dominic Silvester was harmed; and

4. Dr. Niparko's conduct was a substantial factor in causing Dominic Silvester's harm."

Respondent objected to the proposed inclusion of language that would allow the jury to find Silvester was "vulnerable," given the parties' undisputed fiduciary relationship as doctor and patient, which established Niparko owed a fiduciary duty to Silvester as a matter of law. In response, Silvester asserted that he and Niparko had a separate "confidential relationship which is driven by the vulnerability and the taking advantage of the vulnerability of the other party" and that this was "a subset of constructive fraud." Respondent argued there was no need to ask the jury to decide the factual question whether there was a confidential relationship between Niparko and Silvester. Respondent explained that inquiry would only serve as an alternate path to establishing a fiduciary duty if no legally recognized fiduciary relationship exists between the parties, and "they've already satisfied the duty issue by virtue of the fact that there is a fiduciary duty owed by Dr. Niparko to Mr. Silvester because of the physician patient relationship."

The trial court delayed its decision to conduct further research, stating: "I don't know that you need to prove [a confidential relationship] if you've already got the fiduciary relationship. That's what I'm going to be looking at. . . . But what I'm saying is that, if you are required to have one or the other and you've got one, and you don't need to prove the other, why do you need to have it in there?"

12

### b. *The final constructive fraud, fiduciary duty and reasonable reliance jury instructions*

Over Silvester's continued objections, the trial court gave the jury the following constructive fraud instruction, which omitted the alternative instruction for the jury to determine whether Silvester was "vulnerable":

"It is stipulated that Dominic Silvester and Dr. Niparko were in a fiduciary (doctor-patient) relationship. Dominic Silvester claims he was harmed because Dr. Niparko misused the fiduciary relationship, which constitutes constructive fraud. To establish this claim, Dominic Silvester must prove the following:

1. That Dr. Niparko knew or should have known that Dominic Silvester did not need the medical treatment he was receiving; or that Dominic Silvester did not have the disease for which he was being treated; or that Dominic Silvester's medical treatment was harming and not helping him; or that Dr. Niparko's treatment had caused Dominic Silvester harm; or that Dr. Niparko was not acting in Dominic Silvester's best interests.

2. Dr. Niparko misled Dominic Silvester by providing him with inaccurate or incomplete information; or by failing to disclose some or all of the above information.

3. That if accurate and complete information had been provided, or omitted information had been disclosed, Dominic Silvester reasonably would have behaved differently.

4. Dominic Silvester was harmed; and

5. Dr. Niparko's conduct was a substantial factor in causing Dominic Silvester's harm."

The trial court separately gave an explanatory instruction on fiduciary duty (CACI No. 4100), stating, "A doctor owes what is known as a fiduciary duty to his or her patient. A fiduciary

13

duty imposes on a doctor a duty to act with the utmost good faith in the best interests of his or her patient."  The court also stated in its reasonable reliance instruction (CACI No. 1908):  "Because of their doctor/patient fiduciary relationship, it is presumed that Dominic Silvester reasonably relied on Dr. Niparko's misleading actions, statements and omissions, though this presumption may be overcome by other evidence.  The defendant bears the burden of rebutting this presumption by proving with substantial evidence that Dominic Silvester could not have reasonably relied on Dr. Niparko's misleading actions, statements and omissions."

### c.  *Standard of review*

"Appellate courts apply a de novo standard of review when determining whether the trial court's jury instructions were proper because the propriety of a jury instruction is a question of law."  (*Harb v. City of Bakersfield* (2015) 233 Cal.App.4th 606, 617.)

### d.  *Law of constructive fraud*

Constructive fraud is distinct from actual fraud as "a unique species of fraud applicable only to a fiduciary or confidential relationship."  (*Assilzadeh v. California Federal Bank* (2000) 82 Cal.App.4th 399, 415 (*Assilzadeh*); accord, *Prakashpalan v. Engstrom, Lipscomb & Lack* (2014) 223 Cal.App.4th 1105, 1131 (*Prakashpalan*).)  "'Fiduciary' and 'confidential' relationships are relationships existing between parties to a transaction wherein one party is duty-bound to act with the utmost good faith for the benefit of the other."  (*Brown v. Wells Fargo Bank, N.A.* (2008) 168 Cal.App.4th 938, 959-960 (*Brown*).)  "'The essence of a fiduciary or confidential relationship is that the parties do not deal on equal terms because the person

14

in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party.'" (*Richelle L. v. Roman Catholic Archbishop* (2003) 106 Cal.App.4th 257, 271 (*Richelle L.*).)

Constructive fraud "'arises on a breach of duty by one in a confidential or fiduciary relationship to another which *induces justifiable reliance* by the latter *to his prejudice.*'" (*Estate of Gump* (1991) 1 Cal.App.4th 582, 601 (*Gump*), quoting *Odorizzi v. Bloomfield School Dist.* (1966) 246 Cal.App.2d 123, 129, italics in *Gump*.) Civil Code section 1573, subdivision (1), defines constructive fraud as "any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or anyone claiming under him, by misleading another to his prejudice, or to the prejudice of anyone claiming under him[.]" (Civ. Code, § 1573, subd. (1); see *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 981, fn. 13 (*Engalla*); *Barrett v. Bank of America* (1986) 183 Cal.App.3d 1362, 1368 (*Barrett*).) "The breach of duty referred to in section 1573 must be one created by the confidential relationship, which is one of the facts constituting the fraud." (*Byrum v. Brand* (1990) 219 Cal.App.3d 926, 937.) "'"In its generic sense, constructive fraud comprises all acts, omissions and concealments involving a breach of legal or equitable duty, trust, or confidence, and resulting in damages to another. [Citations.] Constructive fraud exists in cases in which conduct, although not actually fraudulent, ought to be so treated—that is, in which such conduct is a constructive or quasi fraud, having all the actual consequences and all the legal effects of actual fraud." [Citation.]' [Citations.]" (*Prakashpalan, supra,* 223 Cal.App.4th at p. 1131.)

15

The special relationship of the parties is what establishes the duty and forms the basis for constructive fraud, which "'usually arises from a breach of duty where a relation of trust and confidence exists.'" (*Gump, supra,* 1 Cal.App.4th at p. 601, quoting *Barrett, supra,* 183 Cal.App.3d at p. 1369.) "'Constructive fraud allows conduct insufficient to constitute actual fraud to be treated as such where the parties stand in a fiduciary relationship.'" (*Engalla, supra,* 15 Cal.4th at p. 981, fn. 13.) It differs from actual fraud "primarily in the type of conduct which may be treated as fraudulent, such as a failure to disclose material facts within the knowledge of the fiduciary." (*Gump,* at p. 601; see *Michel v. Moore & Associates, Inc.* (2007) 156 Cal.App.4th 756, 762 ["A fiduciary's failure to share material information with the principal is constructive fraud, a term of art obviating actual fraudulent intent"]; *Tyler v. Children's Home Society* (1994) 29 Cal.App.4th 511, 519-520 (*Tyler*) ["Unlike actual fraud and undue influence, which generally involve active misconduct, such as an intent to deceive or misrepresentation by the defendant, a constructive fraud claim allows relief for negligent omissions constituting breach of duty in a confidential relationship"].)

Additionally, in a fiduciary relationship it is presumed that a beneficiary reasonably relies on the fiduciary. (*Edmunds v. Valley Circle Estates* (1993) 16 Cal.App.4th 1290, 1302 (*Edmunds*) ["a representation in the context of a trust or fiduciary relationship creates a rebuttable presumption of reasonable reliance subject to being overcome by substantial evidence to the contrary"]; *Gump, supra,* 1 Cal.App.4th at p. 602 ["the reliance element is relaxed in constructive fraud to the extent we may presume reasonable reliance upon the

misrepresentation or nondisclosure of the fiduciary, absent direct evidence of a lack of reliance"].) Thus, "[i]n its application, constructive fraud not only expands the range of conduct which may be characterized as fraudulent, it also presumes the element of reliance absent substantial evidence to the contrary." (*Edmunds,* at p. 1302, citing *Gump,* at pp. 601–602.)

> *e. Because Niparko had an undisputed fiduciary duty to Silvester, the jury did not need to find the parties had a confidential relationship giving rise to a fiduciary duty*

Silvester argues that he and Niparko had a fiduciary relationship arising from their doctor-patient relationship and a legally distinct confidential relationship based on Silvester's particular vulnerability and intense trust in Niparko. Silvester argues their interactions reflected a relationship that was "far more than an ordinary doctor-patient relationship," providing an "alternative legal basis" for a constructive fraud claim based on confidential relationship. We reject Silvester's contention that the jury's independent finding of a confidential relationship would have provided an alternative path to establishing liability for his constructive fraud claim.

Fiduciary and confidential relationships each "ordinarily arise[] when one party reposes a confidence in the integrity of the other, and the other voluntarily accepts that confidence." (*Brown, supra,* 168 Cal.App.4th at pp. 959-960.) "Both relationships give rise to a fiduciary duty, that is, a duty 'to act with the utmost good faith for the benefit of the other party.'" (*Persson v. Smart Inventions, Inc.* (2005) 125 Cal.App.4th 1141, 1160 (*Persson*).) However, they differ in that "fiduciary relations arise out of certain canonical relationships that are legally defined and regulated," whereas confidential relations "do not fall

into well-defined categories of law" but nevertheless "give[] rise to a fiduciary duty" due to the vulnerability of one party to the other under the circumstances. (*Richelle L., supra,* 106 Cal.App.4th at p. 270.) "Technically, a fiduciary relationship is a recognized legal relationship such as guardian and ward, trustee and beneficiary, principal and agent, or attorney and client [Citation.], whereas a 'confidential relationship' may be founded on a moral, social, domestic, or merely personal relationship as well as on a legal relationship." (*Id.* at p. 271; accord, *Hudson v. Foster* (2021) 68 Cal.App.5th 640, 663.)

Accordingly, although "a fiduciary relation in law is ordinarily synonymous with a confidential relation" (*Herbert v. Lankershim* (1937) 9 Cal.2d 409, 483; *Wolf v. Superior Court* (2003) 107 Cal.App.4th 25, 29 (*Wolf*)), the converse is less straightforward. Rather, "[a] confidential relation may exist where there is no fiduciary relation" (*Persson, supra,* 125 Cal.App.4th at p. 1160; see *Oakland Raiders v. National Football League* (2005) 131 Cal.App.4th 621, 631, fn. 7 [noting "a fiduciary duty may arise out of a confidential relationship that is not one that is considered a legally recognized fiduciary relationship"].). In the absence of a recognized fiduciary relationship, the existence of a confidential relationship giving rise to a fiduciary duty is determined by the factfinder. (*Persson, supra,* 125 Cal.App.4th at pp. 1160-1162.)

The doctor-patient relationship is an archetypal fiduciary relationship. (See *Hahn v. Mirda* (2007) 147 Cal.App.4th 740, 748 ["The doctor-patient relationship is a fiduciary one and as a consequence of the physician's 'fiducial' obligations, the physician is prohibited from misrepresenting the nature of the patient's medical condition"]; *Mathis v. Morrissey* (1992) 11 Cal.App.4th

18

332, 339 ["a physician has a fiduciary duty to disclose all information material to the patient's decision" to consent to treatment]; *Moore v. Regents of the Univ. of California* (1990) 51 Cal.3d 120, 129 [recognizing doctor-patient relationship is a fiduciary relationship].) By its nature, the fiduciary relationship between doctor and patient is inherently a "confidential relationship," as courts have long recognized. (See *Gutierrez v. Mofid* (1985) 39 Cal.3d 892, 899 [physician has a "fiduciary and confidential relationship with his client or patient"]; *Sanchez v. South Hoover Hospital* (1976) 18 Cal.3d 93, 97 ["the fiduciary and confidential relationship created between physician and patient" imposes duty of disclosure]; *Stafford v. Shultz* (1954) 42 Cal.2d 767, 777 (*Stafford*) ["the confidence growing out of the relationship of doctor and patient" imposes fiduciary duty to disclose material medical information].) Thus, "[t]he duty of disclosure is fiduciary in nature *because of* the confidential patient-physician relationship, the duty of disclosure is measured by fiduciary standards (not limited by medical standards), and the physician subjects himself to liability should he withhold facts necessary to a total disclosure [Citation.]." (*Nelson v. Gaunt* (1981) 125 Cal.App.3d 623, 634, italics added.)

Distilled to its essential elements, a claim for constructive fraud requires (1) a fiduciary or confidential relationship giving rise to a fiduciary duty; (2) breach of fiduciary duty; (3) justifiable reliance; and (4) resulting injury. (See *Tyler v. Children's Home Society* (1994) 29 Cal.App.4th 511 at p. 520 ["Constructive fraud arises on a breach of duty by one in a confidential or fiduciary relationship to another that induces justifiable reliance by the latter to his or her prejudice. Actual reliance and causation of

19

injury must be shown."].)[3]  As a result, to prove constructive fraud a plaintiff must establish a fiduciary relationship with the defendant—either because that relationship is already legally recognized (e.g., the doctor patient fiduciary relationship) or because the parties had a confidential relationship that created a fiduciary relationship.

Here, given the inherent "confidential relationship existing between a patient and his physician" (*Stafford, supra,* 42 Cal.2d at p. 779) and the parties' stipulation that Silvester and Niparko were in a fiduciary relationship,  a relationship imposing a fiduciary duty was established as a matter of law.  As Silvester concedes,  the fiduciary duty owed in either a traditional fiduciary relationship or confidential relationship is the same: the party in the more powerful position must "act with the utmost good faith for the benefit of the other."  (*Brown, supra,* 168 Cal.App.4th at pp. 959-960.)  No legally distinct duty arises from one versus the other, and Silvester cites no authority that suggests otherwise.  Therefore, we agree with the trial court that

---

[3]      Certain cases set forth the elements of constructive fraud as "(1) a fiduciary or confidential relationship; (2) nondisclosure (breach of fiduciary duty); (3) intent to deceive, and (4) reliance and resulting injury (causation)."  (See, e.g., *Prakashpalan, supra,* 223 Cal.App.4th at p. 1131, quoting *Younan v. Equifax Inc.* (1980) 111 Cal.App.3d 498, 516, fn. 14.)  However, as noted in the use notes to CACI No. 4111 for constructive fraud claims under Civil Code section 1573, "these elements conflict with the statute in at least two ways.  First, the statute clearly states that no fraudulent intent (or intent to deceive) is required.  Second, the statute is not limited to nondisclosure; it extends to information that is disclosed, but misleading."  (Judicial Council of Cal., Civ. Jury Instns. (2020 ed.) Directions For Use to CACI No. 4111.)

20

the jury was not required to find a confidential relationship creating a fiduciary duty to establish such a duty existed for purposes of a constructive fraud claim.

Because it was undisputed that Niparko owed a fiduciary duty to Silvester, Silvester's proposed instruction "would be redundant and confusing." (*Ford v. Polaris Industries, Inc.* (2006) 139 Cal.App.4th 755, 775.) Where an element of a cause of action is already established as a matter of law or its finding is subsumed by another test, it is not necessary for the jury to independently determine that element. (See *ibid.* [where finding of a jet ski design defect established increased risk of harm as a matter of law, there was "no need" for special instruction also requiring plaintiffs to prove the defect increased risk]; *Mayes v. Bryan* (2006) 139 Cal.App.4th 1075, 1080 [in wrongful death action, "trial court did not err in refusing to instruct the jury on 'but for' causation because the jury was instructed on 'substantial factor' and 'but for' is subsumed under the substantial factor test"; "instruction would have been redundant, with the result that the omission did not prejudice defendants"]; *Johnson v. Matson Nav. Co.* (1958) 163 Cal.App.2d 336, 339 [where "instructions requested by appellant were redundant, . . . their refusal was not error"].) There was no need for Silvester's proposed instruction, and the trial court did not err in refusing to give it.

f. *The jury instruction did not improperly limit the scope of Silvester's constructive fraud claim*

Silvester also argues the court's instruction improperly limited the scope of his constructive fraud claim solely to misrepresentation and omission about Silvester's medical care rather than for conduct relating to his solicitation of donations.

21

We disagree. The constructive fraud instruction required the jury to find Niparko "knew or should have known that Dominic Silvester did not need the medical treatment he was receiving; or that Dominic Silvester did not have the disease for which he was being treated; or that Dominic Silvester's medical treatment was harming and not helping him; or that Dr. Niparko's treatment had caused Dominic Silvester harm; *or that Dr. Niparko was not acting in Dominic Silvester's best interests*," that Niparko "misled Dominic Silvester by providing him with inaccurate or incomplete information; or by failing to disclose some or all of the above information"; and that Silvester reasonably would have behaved differently "if accurate and complete information had been provided, or omitted information had been disclosed"; Silvester was harmed, and Niparko's conduct was a substantial factor in that harm. (Italics added.)

The trial court also gave a reliance instruction (CACI No. 1907) instructing that "Dominic Silvester relied on any one of Dr. Niparko's misrepresentations or omissions if: 1. The misrepresentation or omission substantially influenced Dominic Silvester to make financial pledges and payments to Johns Hopkins and to benefit Dr. Niparko; and 2. He would probably not have made the financial pledges and payments, or continued his relationship with Dr. Niparko, if Dr. Niparko had not made the misrepresentation or omitted the information. It is not necessary for a misrepresentation or omission to be the only reason for Dominic Silvester's actions."

Silvester contends that as instructed the jury could "consider only whether Mr. Silvester had been lied to by Dr. Niparko about his medical care." However, the constructive fraud instruction permitted the jury to find that Niparko was

22

liable because he was not acting in Silvester's best interests and caused Silvester harm.  This instruction is in line with Civil Code section 1573, subdivision (1), which states constructive fraud consists of "*any* breach of duty which, without an actually fraudulent intent, *gains an advantage to the person in fault*, or anyone claiming under him, *by misleading another to his prejudice*, or to the prejudice of any one claiming under him[.]" (Italics added.)  The constructive fraud instruction, particularly when read in tandem with the reliance instruction, confirms the jury was properly informed that it could find (if the facts supported such a finding) that Niparko's conduct in soliciting donations was a breach of his duty to Silvester.

 2. *The Trial Court's Evidentiary Rulings*
  a. *Standard of review*
  "Trial court rulings on the admissibility of evidence, whether in limine or during trial, are generally reviewed for abuse of discretion."  (*Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1317, accord, *Zhou v. Unisource Worldwide, Inc.* (2007) 157 Cal.App.4th 1471, 1476.)  "The trial court's error in excluding evidence is grounds for reversing a judgment only if the party appealing demonstrates a 'miscarriage of justice'—that is, that a different result would have been probable if the error had not occurred."  (*Zhou,* at p. 1480; see Evid. Code, § 354; Code Civ. Proc., § 475.)  Under Evidence Code section 353, a verdict also "shall not be reversed due to the erroneous admission of evidence unless:  '(a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear *the specific ground of the objection* or motion . . . .'"  (*Atkins v. Strayhorn* (1990) 223 Cal.App.3d 1380, 1390; see Evid. Code,

§ 353, subd. (a).)  If a trial court's decision to admit or exclude evidence involves a question of law, we review that decision de novo.  (*Zhou,* at p. 1476.)

      *b. The trial court prejudicially abused its discretion when it excluded evidence regarding Silvester's vulnerability and emotional distress, and medical ethics evidence*

      *i.    Silvester's vulnerability and emotional distress*

Silvester contends the trial court erroneously excluded evidence of his vulnerability and emotional distress, including when it granted Respondent's Motion in Limine No. 1 to exclude evidence of Silvester's emotional distress during his relationship with Niparko, and when it sustained relevance objections[4] to his medical expert's testimony regarding his observations of Silvester and the expert's opinion that medication caused Silvester to be vulnerable and impaired, both behaviorally and emotionally. Silvester asserts the trial court's error was exacerbated by allowing Respondent to introduce testimony that Silvester was not vulnerable or behaviorally impaired during their relationship, while not allowing Silvester to introduce contrary evidence.[5]

The court also precluded Silvester's expert from showing the jury a slide containing the word "vulnerability," stating:

---

[4]     "Relevant evidence" is that which has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."

[5]     The court did permit Silvester to present some evidence on this point, including the testimony of both Silvester and his wife who described his deteriorated physical and emotional state.

"Vulnerability is not going to be at issue in this case because of the fact that we have an automatic fiduciary duty due to the physician patient relationship, so I would suggest you perhaps delete that, okay." Silvester argued that his vulnerability was relevant to reliance as well as to the existence and breach of Niparko's fiduciary duty. The trial court stated that vulnerability "relates to the issue of whether or not you create the relationship that gives rise to this cause of action. And in this case you have an automatic one which is not necessarily [sic] to be separately proven and has already been established. . . . [The] ruling has not changed. . . . You already have a breach of fiduciary duty aspect of this, which is again already established and so therefore you—it doesn't enhance. It doesn't make it different. It didn't make it better. . . ."

On appeal, Silvester argues evidence of his vulnerability and emotional distress was relevant to proving the existence and breach of a confidential relationship for purposes of constructive fraud and relevant to justifiable reliance for actual fraud, on which the jury was also instructed.[6] Specifically, Silvester

---

[6]     The trial court gave the following instructions on actual fraud:

"[CACI] 1900. Intentional Misrepresentation

In addition to his constructive fraud claim on which I just instructed you, Dominic Silvester claims that Dr. Niparko made a false representation that harmed him. To establish this claim, Dominic Silvester must prove the following:

1. That Dr. Niparko represented to Dominic Silvester that a fact was true;
2. That Dr. Niparko's representation was false;

asserts evidence of his vulnerability was "relevant to foreclosing any attempt by Respondent to rebut Mr. Silvester's justifiable reliance required for actual fraud, . . . ." He argues the trial court's rulings "were particularly prejudicial because they skewed the evidence by receiving *Respondent's* evidence to *rebut* Mr.

---

3. That Dr. Niparko knew that the representation was false when he made it, or that he made the representation recklessly and without regard for its truth;

4. That Dr. Niparko intended that Dominic Silvester rely on the representation;

5. That Dominic Silvester reasonably relied on Dr. Niparko's representation;

6. That Dominic Silvester was harmed; and

7. That Dominic Silvester's reliance on Dr. Niparko's representation was a substantial factor in causing Dominic Silvester's harm."

"[CACI] 1901. Concealment

As a third and separate claim, Dominic Silvester also claims that he was harmed because Dr. Niparko concealed certain information. To establish this claim, Dominic Silvester must prove the following:

1. That Dr. Niparko intentionally failed to disclose certain facts to Dominic Silvester;

2. That Dominic Silvester did not know of the concealed facts;

3. That Dr. Niparko intended to deceive Dominic Silvester by concealing the facts;

4. That had the omitted information been disclosed, Dominic Silvester reasonably would have behaved differently;

5. That Dominic Silvester was harmed; and

6. That Dr. Niparko's concealment was a substantial factor in causing Dominic Silvester's harm."

Silvester's vulnerability, yet excluding evidence Mr. *Silvester's* evidence of his vulnerability." (Italics in original.)

For the reasons articulated above, we find the court did not abuse its discretion when it excluded the vulnerability and emotional distress evidence that Silvester attempted to introduce for the purpose of establishing that he had a confidential relationship with Niparko that created a fiduciary duty. However, we agree with Silvester that evidence of his vulnerability and emotional distress is relevant to his justifiable reliance, which is an element of both actual and constructive fraud.

When a fraud claim is based on a misrepresentation or nondisclosure by a fiduciary in a superior position of knowledge or power, reasonable reliance is presumed: A representation by the party in the superior position in the fiduciary relationship "creates a rebuttable presumption of reasonable reliance subject to being overcome by substantial evidence to the contrary." (*Edmunds, supra,* 16 Cal.App.4th at p. 1302.) Here, the jury was instructed that there was a fiduciary relationship between Niparko and Silvester, and was instructed to presume that Silvester reasonably relied on Niparko's representations, unless Niparko rebutted the presumption with substantial evidence. Respondent sought to rebut that presumption by successfully introducing testimony that Silvester was not vulnerable or behaviorally impaired, including:

・Kelley's testimony that Silvester seemed "lucid" with "his wits about him," and never appeared "vulnerable" or "brow beaten" by Niparko;

・Testimony of Johns Hopkins Medicine Dean Edward Millier that Silvester did not have diminished capacity;

27

• Testimony of Johns Hopkins infectious disease doctor Paul Auwaerter about his "impression" of Silvester as physically fit;

• Testimony of defense expert Dr. Robert Jackler that Silvester was intelligent and able to absorb information given to him;

• Seo's testimony that Silvester suffered little or no side effects from his chemotherapy drugs; and

• Hoffman's testimony on cross-examination that he had not observed Silvester display mental incapacity.

The trial court erred when it foreclosed Silvester from presenting evidence regarding his vulnerability and emotional distress, which was offered to disprove the evidence respondent presented to rebut the presumption of Silvester's reasonable reliance on Niparko. This included Silvester's medical expert's observations of Silvester and his opinion that steroids and chomotherapy drugs made Silvester vulnerable and impaired him behaviorally and emotionally. The evidence of Silvester's vulnerability was relevant to the jury's determination regarding whether Respondent succeeded in overcoming the presumption that Silvester reasonably relied on Niparko.

### ii.    Medical ethics evidence

The trial court denied Respondent's Motion in Limine No. 5 to exclude the testimony of Silvester's medical ethics expert, Dr. Erin Egan, regarding codes of ethics and professional guidelines applicable to physicians' fundraising from patients and HIPAA privacy requirements. However, the court ruled Egan could not testify about whether Niparko violated applicable medical ethics standards while simultaneously treating and fundraising from Silvester. The trial court explained Egan would not be allowed to

28

reach conclusions that were properly in the purview of the trier of fact but "certainly can testify about what these standards are, but can't say: I've decided this is what happened and that's a violation of, okay? Other than that, I think that it's an appropriate use of expert testimony . . . ." The court confirmed it was "fair game to ask Dr. Egan: How should this situation [have] been handled, if consistent with the norms?" if it was a "complete hypothetical."

At trial, the court reiterated Egan could not testify regarding whether Niparko had acted unethically when he simultaneously treated and solicited money from Silvester, commenting, "[T]his is not a case for breach of medical ethics. This is a fraud and concealment case." The court stated: "Our claims are fraud, fraud based on concealment, and constructive fraud. That requires misrepresentation or concealment of material facts, not violations of HIPAA, not violations of ethical issues." The trial court also stated that HIPAA violations were "irrelevant."

Silvester argues the court erroneously prevented Egan from expressing her opinions that Niparko's solicitation of Silvester for donations (when Niparko was Silvester's treating physician) violated applicable medical ethics standards. Silvester also asserts that when Niparko shared information about Silvester's medical condition and shared private communications between Silvester and Niparko with third parties, Niparko violated Silvester's privacy and HIPAA rights. Silvester contends evidence that Niparko violated medical ethical guidelines "is relevant to establish Niparko's breach of the 'special,' 'confidential' and 'trust' aspects of their relationship" and

29

relevant to proving Niparko took advantage of Silvester's "vulnerability" while soliciting money from him.

A breach of medical ethics may be a breach of fiduciary duty (see *Scripps Clinic v. Superior Court* (2003) 108 Cal.App.4th 917, 930-931 [triable issue of fact whether medical clinic breached its fiduciary duty by violating medical ethics code]), if that breach of fiduciary duty results in "misleading another to his prejudice" (Civ. Code, § 1573). Accordingly, evidence that Niparko's solicitation activities violated medical ethics standards is relevant, and the trial court abused its discretion by prohibiting Egan from opining whether Niparko had violated ethical guidelines.

As previously discussed, Silvester may have been able to establish Niparko was liable for constructive fraud under Civil Code section 1573 if the jury found that Niparko was not acting in Silvester's utmost best interests and misled Silvester to his harm. If the jury found that Niparko violated medical ethics standards in his solicitation of Silvester, there is a reasonable chance the jury would have reached a verdict in Silvester's favor.

It is probable that the jury would have reached a different conclusion if the court had not erred, and instead had permitted Silvester to present evidence regarding his vulnerability and emotional distress, as well as medical ethics evidence. The trial court's exclusion of that evidence was a prejudicial abuse of discretion requiring a new trial.

### iii. The trial court did not err in excluding evidence of insurance

Silvester contends the trial court abused its discretion by denying Silvester's motion in limine to permit reference to Niparko's insurance and granting Respondent's motion in limine

30

to exclude references to indemnity or insurance protecting the estate.  Silvester argues he was prejudiced because he was prevented from introducing evidence that MCIC was the insurer of the estate and any recovery would first come from insurance or other indemnity obligations protecting the estate, leaving the jury with the impression he was pursuing the assets of a grieving widow.

Evidence Code section 1155 makes evidence of a defendant's liability insurance inadmissible to prove negligence or other wrongdoing.  "The purpose of this statute is to prevent the prejudicial use of evidence of liability insurance[.]"  (*Industrial Indemnity Co. v. Mazon* (1984) 158 Cal.App.3d 862, 865.)  Evidence of a defendant's insurance coverage generally ""is regarded as both irrelevant and prejudicial to the defendant."""  (*Blake v. E. Thompson Petroleum Repair Co.* (1985) 170 Cal.App.3d 823, 830.)  There is a substantial risk of prejudice to a defendant from the introduction of evidence the defendant is insured for the harm he or she allegedly caused—"[a]ny such evidence would have an obvious potential to prejudice the jury's determination of the insured's liability."  (*Moradi–Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 311.)

Here, although the parties agreed Silvester would not seek to execute on any estate assets other than insurance and indemnity protections, that agreement was not material to whether the trial court abused its discretion in its in limine rulings because the parties did not reach that agreement until the last day of trial.[7]  During the motions in limine, it was

---

[7]     Although the trial court, during the hearing on the in limine motions, told counsel they could raise the issue again if "the world has changed," Silvester did not renew his in limine

31

possible that Silvester could recover damages from estate property (over policy limits) because Silvester named Niparko's widow (the personal representative of the estate) as a defendant. (Prob. Code, § 553 [stating "[u]nless the personal representative is joined as a party, a judgment in the action . . . does not adjudicate rights by or against the estate"].)

Silvester also argues the trial court prejudicially erred when it prevented him from using the fact of Niparko's indemnification by Johns Hopkins' insurer to impeach the impartiality of Johns Hopkins-related witnesses. "Trial courts, for obvious reasons, have generally kept evidence from the jury that a defendant had insurance coverage on the involved liability. However, every rule has its exceptions, and '(f)acts tending to show interest, bias or motive on the part of a witness may always be brought out on cross-examination even though it may thereby be disclosed that the defendant was protected by insurance.'" (*Brainard v. Cotner* (1976) 59 Cal.App.3d 790, 795, quoting *Hart v. Wielt* (1970) 4 Cal.App.3d 224, 231 (1970).) Silvester provides no explanation how Niparko's indemnification by Johns Hopkins' insurer would tend to show interest, bias, or motive on the part of Johns Hopkins-affiliated witnesses.

We conclude the trial court did not abuse its discretion when it excluded evidence of insurance under Evidence Code section 1155.

---

request to permit reference to Niparko's insurance after he entered into the agreement not to execute on estate assets.

*iv.    Silvester forfeited the argument that the trial court erred in excluding evidence of Niparko's character*

Silvester contends that four witnesses (Angela Niparko, Nancy Mellon, Dean Miller and Dr. Warren Ross) were improperly allowed to testify to Niparko's good character. Evidence of a person's character "generally is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101.) At trial Silvester did not object to the testimony of any of these witnesses as inappropriate character evidence. He argues he preserved his objections by filing his Motion in Limine No. 1 (Exclude Evidence of Decedent's Reputation or Character,) noting "[a] motion in limine to exclude evidence is normally sufficient to preserve an issue for review without the necessity for defendant to renew an objection at the time the evidence was offered." (*Summers v. A.L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1184 [objections preserved on appeal where applicable motion in limine was denied and party also renewed its specific objections at trial]).

We disagree that Silvester sufficiently preserved his objections. In ruling on Silvester's Motion in Limine no. 1, the trial court stated: "I'm not expressly granting or denying it, but I'm telling you the limitation is going to be based on a case-by-case or question-by-question analysis, all right?" Although "'"[a]n attorney who submits to the authority of an erroneous, adverse ruling after making appropriate objections or motions, does not waive the error in the ruling by proceeding in accordance therewith and endeavoring to make the best of a bad situation for which he was not responsible"'" [Citations.]" (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 212–213), here the trial court

33

reserved its ruling on this issue, asserting it would determine the admissibility of character evidence on a case-by-case basis during questioning at trial. It was incumbent on Silvester to specifically object to inadmissible character evidence during the trial. (Evid. Code, § 353 [objection to evidence must be "timely made and so stated as to make clear the specific ground of the objection or motion"].)

Silvester argues the trial court overruled his relevance objection to Ross's testimony about Niparko's candidacy for a chair position with USC, and the court denied his motion to strike Ross' testimony based on hearsay and relevance. He also notes that he objected to Angela Niparko's testimony based on relevance, under section 352 and as calling for testimony to the ultimate fact whether Niparko would not have acted fraudulently; he then moved to strike, and his motion was denied.

However, Silvester's objections below were not the same ones he now makes on appeal. To satisfy Evidence Code section 353, subdivision (a), the objection or motion to strike must be both timely and specific as to its basis. An objection to evidence must generally be preserved by specific objection at the time the evidence is introduced; the opponent cannot make a 'placeholder' objection stating general or incorrect grounds (e.g., 'relevance') and revise the objection later . . . ." (*People v. Demetrulias* (2006) 39 Cal.4th 1, 21-22 [objection based on relevance, foundation, speculation, or nonresponsiveness "does not, in itself, alert the trial court to the claim that the testimony objected to is inadmissible character evidence"].) "What is important is that the objection fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the

objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling. If the court overrules the objection, the objecting party may argue on appeal that the evidence should have been excluded for the reason asserted at trial, but it may not argue on appeal that the court should have excluded the evidence for a reason different from the one stated at trial." (*People v. Partida* (2005) 37 Cal.4th 428, 435.)

Silvester's objections "neither mentioned Evidence Code section 1101 nor asserted that the evidence constituted inadmissible character evidence." (*People v. Valdez* (2012) 55 Cal.4th 82, 130 [objections that evidence was "irrelevant, cumulative, lacking in foundation, or prejudicial . . . were insufficient to preserve for appeal the claim that the evidence was inadmissible under Evidence Code section 1101, subdivision (a)"].) Silvester did not accurately and timely object to what he characterizes as the trial court's improper admission of character evidence.

3. *The Trial Court Did Not Err In Its Order Granting Summary Adjudication on Silvester's Punitive Damages Claim*

In granting summary adjudication on Silvester's punitive damages claim, the trial court held that "no punitive damages may be awarded against the decedent's Estate, even if MCIC is to pay the judgment." Silvester maintains this ruling erroneously conflates the estate (as insured by MCIC) and the personal representative of the estate. Relying on Probate Code sections 550 through 554 (governing claims against decedents covered by insurance), Silvester contends Code of Civil Procedure section 377.42 only prohibits recovery of punitive or exemplary damages

35

against a deceased defendant's personal representative and not against an insurance company covering the deceased defendant's estate. We conclude the plain language of Probate Code section 552 mandates that claims against decedents covered by insurance must proceed "in the same manner as if the claim had been brought against the personal representative," and nothing in the law suggests that liability for punitive or exemplary damages should be determined differently than it would be against the personal representative.

### a. *Standard of review*

We review de novo the trial court's ruling on a motion for summary adjudication. (*Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248, 273; *Doe v. Lawndale Elementary School Dist.* (2021) 72 Cal.App.5th 113, 124.) We also "review questions of statutory construction de novo. Our primary task 'in interpreting a statute is to determine the Legislature's intent, giving effect to the law's purpose.'" (*Akopyan v. Superior Court of Los Angeles County* (2020) 53 Cal.App.5th 1094, 1098, quoting *California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1041.) "We give the words of the statute 'a plain and commonsense meaning' unless the statute specifically defines the words to give them a special meaning." (*MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1083, quoting *Flannery v. Prentice* (2001) 26 Cal.4th 572, 577.) In so doing, "''we do not construe statutes in isolation, but rather read every statute 'with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness.'''" (*Smith v. Superior Court* (2006) 39 Cal.4th 77, 83; accord, *People v. Gonzalez* (2017) 2 Cal.5th 1138, 1141 ["'[W]e consider the language of the entire scheme and

related statutes, harmonizing the terms when possible.'
[Citations.]")

> b. *Code of Civil Procedure section 377.42's ban on recovery of punitive or exemplary damages applies equally to actions against a personal representative and actions against the estate under Probate Code 550*

Code of Civil Procedure section 377.42 provides, "In an action or proceeding against a decedent's personal representative or, to the extent provided by statute, against the decedent's successor in interest, on a cause of action against the decedent, all damages are recoverable that might have been recovered against the decedent had the decedent lived except damages recoverable under Section 3294 of the Civil Code or other punitive or exemplary damages."[8]  Code of Civil Procedure section 377.42 is generally understood to extinguish all punitive or exemplary damages claims against an individual upon that individual's death.  (See *Whelan v. Rallo* (1997) 52 Cal.App.4th 989, 992 ["case law has consistently held the right to punitive damages is extinguished . . . if the defendant dies before judgment is entered"]; *Bancroft-Whitney Co. v. Glen* (1966) 64 Cal.2d 327, 357 (1966) ["The cause of action for punitive damages

---

[8]     "Decedent's successor in interest" is defined as "the beneficiary of the decedent's estate or other successor in interest who succeeds to a cause of action or to a particular item of the property that is the subject of a cause of action."  (Code Civ. Proc., § 377.11.)  Given our conclusion that the plain language of Probate Code section 552 mandates that a claim against the estate under section 550 be treated identically to a claim brought against the personal representative, we need not address Respondent's argument that MCIC is Niparko's "successor in interest."

does not survive [decedent's] death," citing Prob. Code, § 573, predecessor to Code Civ. Proc, § 377.42].) The longstanding rationale for this rule is that "since the purpose of punitive damages is to punish the wrongdoer for his acts, accompanied by evil motive, and to deter him from the commission of like wrongs in the future, the reason for such damages ceases to exist with his death," and "punitive damages by way of example to others should be imposed only on actual wrongdoers." (*Evans v. Gibson* (1934) 220 Cal. 476, 490; accord, *Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 666; cf. *Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 982 [holding in legal malpractice case "[i]t is inconsistent with the goal of punishment to transfer the punishment to an actor innocent of the conduct necessary to justify an award of punitive damages"], citing *Evans*, 220 Cal. at pp. 489-490.)

If a decedent was insured, "an action to establish the decedent's liability for which the decedent was protected by insurance may be commenced or continued against the decedent's estate without the need to join as a party the decedent's personal representative or successor in interest" (Prob. Code, § 550), with the estate named as defendant but only the insurer served in the action (*id.*, § 552, subd. (a)).[9] Thereafter, "[t]he proceedings are

---

[9] Probate Code section 550 provides: "(a) Subject to the provisions of this chapter, an action to establish the decedent's liability for which the decedent was protected by insurance may be commenced or continued against the decedent's estate without the need to join as a party the decedent's personal representative or successor in interest. [¶] (b) The remedy provided in this chapter is cumulative and may be pursued concurrently with other remedies."

conducted as if the action were against the personal representative of the estate[.]" (*Meleski v. Estate of Albert Hotlen* (2018) 29 Cal.App.5th 616, 624 (*Meleski*); see Prob. Code, § 552, subd. (a).) However, unless the personal representative is joined as a party and the plaintiff files a creditor claim against the estate, a judgment in an action under Probate Code section 550 "does not adjudicate rights by or against the estate"—damages are "enforceable only from the insurance coverage and not against property in the estate." (Prob. Code, §§ 553-554; see *Meleski,* 29 Cal.App.5th at p. 624; *Estate of Prindle* (2009) 173 Cal.App.4th 119, 129 (*Prindle*).)[10] A plaintiff may concurrently

---

Probate Code section 552 provides: "(a) An action under this chapter shall name as the defendant, 'Estate of (name of decedent), Deceased.' Summons shall be served on a person designated in writing by the insurer or, if none, on the insurer. Further proceedings shall be in the name of the estate, but otherwise shall be conducted in the same manner as if the action were against the personal representative. [¶] (b) On motion of an interested person, or on its own motion, the court in which the action is pending may, for good cause, order the appointment and substitution of a personal representative as the defendant. [¶] (c) An action against the estate of the decedent under this chapter may be consolidated with an action against the personal representative."

[10] Probate Code section 553 provides: "The insurer may deny or otherwise contest its liability in an action under this chapter or by an independent action. Unless the personal representative is joined as a party, a judgment in the action under this chapter or in the independent action does not adjudicate rights by or against the estate."

pursue an action against the personal representative, which allows damages above the policy limits to be enforced against the estate.  (Prob. Code, §§ 550, subd. (b); 553, subd. (b).)

Section 550 et seq. of the Probate Code provides a streamlined way to name the decedent's estate as the defendant to recover insurance proceeds without the need to join the decedent's personal representative as a party.  Proceeding against an insured estate under section 550 "merely simplifies—and in many cases accelerates—recovery against a deceased tortfeasor:  Probate is avoided, the decedent's liability is litigated without placing his or her estate at risk, and recovery is limited to the decedent's available insurance proceeds."  (*Smith v. Interinsurance Exchange* (1985) 167 Cal.App.3d 301, 303-304.)

The crux of Silvester's argument is that because an insured estate may proceed as a nominal defendant in an action against the estate independently of the personal representative of the estate, liability for punitive damages should operate differently against the insurer than against the personal representative.  Silvester attempts to fashion a legal distinction and alternate path to liability where none exists.

---

Probate Code section 554 provides:  "(a) Except as provided in subdivision (b), either the damages sought in an action under this chapter shall be within the limits and coverage of the insurance, or recovery of damages outside the limits or coverage of the insurance shall be waived.  A judgment in favor of the plaintiff in the action is enforceable only from the insurance coverage and not against property in the estate. [¶] (b) Where the amount of damages sought in the action exceeds the coverage of the insurance, subdivision (a) does not apply if both of the following conditions are satisfied: (1) The personal representative is joined as a party to the action. (2) The plaintiff files a claim in compliance with Section 9390."

Silvester does not dispute that Code of Civil Procedure section 377.42 expressly prohibits punitive or exemplary damages in an action against the decedent's personal representative. Rather, he contends, "Substantively, this case has two defendants: (1) the Estate, and (2) the [personal representative]," and suggests that because there is no express statutory bar in the Probate Code to recovery for punitive or exemplary damages from an estate's insurance he should be able to pursue punitive and exemplary damages to the extent of the estate's insurance.[11]

Silvester is incorrect. First, in an action under Probate Code section 550, "[i]t is a legal fiction that the estate is the party"—the estate itself "is not a legal entity" but "'merely a name to indicate the sum total of the assets and liabilities of a decedent.'" (*Meleski, supra,* 29 Cal.App.5th at p. 624.) Where, as here, a personal representative has been appointed and an action filed "against both that representative and the 'estate' of the decedent, the two defendants are really one and the same." *Neuland v. Russell* (1975) 50 Cal.App.3d 1, 6 (*Neuland*) [construing former Probate Code section 721].) An action against the estate of the decedent under Probate Code section 550 may be consolidated with an action against the personal representative (Prob. Code, § 552, subd. (b)) specifically because the liability issues are identical. (See com. to Prob. Code, § 552 ["Consolidation may be appropriate since *the issues relating to liability are the same.*"], italics added.) Thus, there is no

_____

[11] Although "California law prohibits indemnification of punitive damages by insurers" (*Piscitelli v. Friedenberg, supra,* 87 Cal.App.4th at p. 982; see Ins. Code, § 533), Silvester asserts Maryland law applies to the question of insurability and would permit insurance coverage of punitive damages. We need not and do not address this issue in reaching our conclusion here.

substantive distinction between the nominal defendants for purposes of liability.  Including an action against the personal representative merely provides the possibility of recovery from the estate for damages over insurance policy limits.  (Prob. Code, § 553, subd. (b).)

Second, we find dispositive the plain language of Probate Code section 552, subdivision (a), which instructs that actions against an insured decedent under section 550 "shall be in the name of the estate, but *otherwise shall be conducted in the same manner as if the action were against the personal representative.*" (Italics added, see *Meleski, supra,* 29 Cal.App.5th at p. 624 [same]; *Prindle, supra,* (2009) 173 Cal.App.4th 119, 129 [same, noting former Probate Code section 721 had same effect as current section 550 et seq.]; *Neuland, supra,* 50 Cal.App.3d at p. 6 [same, under former Probate Code section 721].)

The commonsense interpretation of the statutory directive to conduct proceedings "in the same manner as if the action were against the personal representative" is that an action against the estate under Probate Code section 550 must be treated identically to an action against the personal representative— including for purposes of liability for punitive damages.  Here, Code of Civil Procedure section 377.42 specifies that no punitive or exemplary damages are available in an action against the personal representative:  "In an action or proceeding against a decedent's personal representative . . . , all damages are recoverable that might have been recovered against the decedent had the decedent lived except damages recoverable under Section 3294 of the Civil Code or other punitive or exemplary damages." Treating an action against the estate under Probate Code section 550 "in the same manner" as an action against the personal

42

representative means the punitive damages limitation in Code of Civil Procedure section 377.42 must apply to both. (Cf. *Sakaguchi v. Sakaguchi* (2009) 173 Cal.App.4th 852, 860 [where one statute stated a statement of damages "shall be served in the same manner as a summons" and another provided for service of a summons by mail, it follows that a statement of damages could be served by mail].) Silvester's assertion that recovery of punitive or exemplary damages is permitted against insurance covering a decedent's estate but not against a decedent's personal representative is directly contradicted by the plain language and unambiguous requirement of Probate Code section 552, subdivision (a), that actions under section 500 "shall be conducted in the same manner as if the action were against the personal representative."

We also reject Silvester's contention that the trial court in its order granting summary adjudication erred by referring to MCIC at all given Respondent's notice of motion for summary judgment, which posed as the sole issue that Silvester "cannot assert a claim for punitive damages against the personal representative in this action." "A motion for summary adjudication tenders only those issues or causes of action specified in the notice of motion, and may only be granted as to the matters thus specified." (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 743-744.) However, the notice does not have to "precisely identif[y]" "the 'matters' at issue"—even just "a listing of the disputed causes of action . . . is sufficient." (*Sequoia Ins. Co. v. Superior Court* (1993) 13 Cal.App.4th 1472, 1478.) Here, particularly because the personal representative and estate defendants are substantively indistinguishable for liability purposes, it is sufficient that the personal

representative's notice of motion raised the issue of punitive damages. Her memorandum also argued that "MCIC is not a tortfeasor or wrongdoer in this case," and Silvester "cannot recover damages against MCIC that do not survive Dr. Niparko's death." The issue was thus squarely before the trial court, which correctly concluded that "the Representative has standing to dispute punitive damages generally as any punitive damage award would necessarily be against the Estate, whether or not MCIC pays such damages."

## DISPOSITION

The judgment is reversed. The matter is remanded for a new trial. Appellant is to recover costs on appeal.


WISE, J.*


We concur:


SEGAL, Acting P. J.　　　FEUER, J.


---

*　Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

44